**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-071 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| WILLIAM P. WASHINGTON, JR. (2), | : | |
| | : | |
| Defendant. | : | |

**ORDER DENYING**
**DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA**

This criminal case is before the Court on Defendant William Pierce Washington

Jr.'s motion to withdraw his guilty plea (Doc. 67) and the parties' responsive memoranda

(Docs. 70, 71).

## I.  BACKGROUND

On June 21, 2017, Defendant William Pierce Washington, Jr. and co-defendant,

William Pierce Washington, III, were charged by way of a two-count indictment with:

conspiracy to sex traffic children, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c)

(Count 1); and sex trafficking of children, in violation of 18 U.S.C. § 1591(a)(1) and

(b)(2) (Count 2).  (Doc. 15).[1]  In sum, the charges alleged that from approximately

December 2016 through on or about April 18, 2017, Defendants conspired to and did

knowingly "recruit, entice, harbor, transport, provide, obtain, advertise, maintain,

patronize, and solicit" a sixteen-year-old female ("Minor Victim A"), knowing and in

---

[1] Defendants in this case are William Pierce Washington, III a/k/a "Bam" ("co-Defendant Washington III") and William Pierce Washington, Jr. a/k/a "Man" ("Defendant").  Co-Defendant Washington III is Defendant's younger brother.

reckless disregard of the fact that Minor Victim A had not attained the age of eighteen and that she would be caused to engage in a commercial sex act. (*Id*.)

At the commencement of the case, defense counsel raised concerns regarding Defendant's competency to stand trial, in response to which this Court held a hearing and ultimately granted the request for a competency evaluation and report. (Docs. 32, 33).[2] Specifically, the Court ordered that Defendant undergo a competency evaluation at a suitable Bureau of Prisons ("BOP") facility and that the evaluation report address, *inter alia*, whether Defendant is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. (Doc. 32 at 5). Moreover, the Order specified that:

> Of particular interest to the Court is: (1) whether Defendant's current medications are appropriate and sufficient to provide him adequate treatment; (2) if Defendant is not competent to stand trial, whether he can be restored to competency; and (3) if Defendant meets the threshold for competency or is restored to competency, and the case proceeds to trial, whether the Court should implement any procedural safeguards (*e.g.*, taking more frequent breaks) to ensure that, given Defendant's cognitive abilities, he is able to understand the proceedings and assist in his defense.

(*Id*. at 4).

Pursuant to the Court's Order, Defendant was committed to FCI Englewood, where Forensic Psychologist Jeremiah Dwyer, Ph.D., conducted Defendant's competency

---

[2] Defendant was originally represented in this case by Attorney Soumyajit Dutta, Esq. In August 2018, after Defendant had entered his guilty plea, and for reasons unrelated to Defendant, this Court granted Mr. Dutta leave to withdraw and appointed Paul Laufman, Esq. to serve as Defendant's CJA counsel, going forward. (Doc. 63).

evaluation and prepared a thorough forensic competency report. (Doc. 35).[3] In sum, Dr. Dwyer opined that while Defendant's cognitive functioning was lower than average, it was not so low as to preclude competency and that Defendant was indeed competent to stand to trial. (*Id*. at 25).

Further, Dr. Dwyer opined that "deficits in [Defendant's] cognitive abilities can be alleviated by recognizing and accommodating [Defendant's] limitations." (*Id*.) And, in response to the Court's inquiry regarding the implementation of procedural safeguards, Dr. Dwyer made "suggestions [that] should minimize the potential impact of [Defendant's] limitations on his ability to proceed." (*Id*.)

Specifically, Dr. Dwyer suggested that the Court offer more frequent breaks, in order for Defendant to have time to regulate his emotional response to stressful circumstances, as well as to allow defense counsel additional opportunities to review new information and developments with Defendant. (*Id*. at 25-26). Dr. Dwyer also suggested that key concepts should be explained to Defendant in a basic manner, using simple words, concrete examples, and written summaries. (*Id*. at 26). Dr. Dwyer further suggested slowing down proceedings, repeating information, allowing Defendant time to ask and answer questions, and "[e]nsuring [Defendant] remembers any legal agreement he is entering by having him recite basic, concrete components of the agreement from

---

[3] As required pursuant to statute, 18 U.S.C. § 4247(c), Defendant's competency evaluation report was filed under seal (Doc. 35) and provided to counsel for both parties.

memory." (*Id.*) Finally, Dr. Dwyer noted the importance of ensuring that Defendant had access to and was taking all of his mental health medication, as prescribed. (*Id.*)[4]

After receiving and reviewing the competency evaluation report, the parties informed the Court that they concurred with Dr. Dwyer's assessment and opinions and, further, stipulated that a competency hearing was unnecessary. (Min. Entry, Oct. 19, 2017). Accordingly, the case proceeded and, after granting a number of continuances to allow the parties adequate time to prepare, the Court established a trial calendar, setting a final pretrial conference for April 17, 2018 and a jury trial to commence on April 23, 2018. (Doc. 37).

On the morning of April 23, 2018, the parties were present in the courtroom by 8:30 a.m., as instructed at the final pretrial conference, in order to address final matters with the Court before the commencement of *voir dire*. At that time, the parties informed court staff that both defendants were re-considering a resolution by plea and, accordingly, asked to delay the pre-*voir dire* proceeding. The Court agreed and allowed the parties to remain in the courtroom to conduct their final plea discussions.[5]

---

[4] Defendant's prescription regimen consists of three separate psychotropic medications, including two medications to be taken daily, as well as one monthly injection. (Doc. 35 at 4). To maintain confidentiality, the Court will not make specific reference to Defendant's mental health diagnosis or prescriptions, which information is detailed in the competency evaluation report. (*Id.*) Thus, any reference in this Order to Defendant receiving and/or taking his prescribed medication, refers specifically to the three prescriptions discussed above.

[5] Because the court proceedings had not yet commenced, the entirety of the communications between the parties and court staff, as well as the parties' plea discussions, occurred off the record.

After two hours of further plea discussions, the parties presented the Court with two signed Rule 11(c)(1)(C) plea agreements, resolving the case as to each defendant. (Docs. 54, 55). Pursuant to the defendants' plea agreements—which agreements were identical in substance with the exception of the Statement of Facts—the defendants agreed to plead guilty to Count 2 of the Indictment, charging sex trafficking of children, and the parties further agreed that, upon acceptance of the Rule 11(c)(1)(C) plea agreement, "the Court may impose a sentence not to exceed one hundred and eighty-eight (188) months imprisonment." (*Id*. at 3). However, as Count 2 carries a mandatory minimum of ten years imprisonment, the agreement, in effect, called for a sentence, at the Court's discretion, within the range of 120 to 188 months. *See* 18 U.S.C. § 1591(b)(2). Additionally, the parties informed the Court that each defendant's plea agreement was contingent upon the plea agreement of the other co-defendant. (Doc. 64 at 22). That is, if either defendant failed to accept his plea agreement, the Government would have the right to withdraw from the co-defendant's plea agreement as well. (*Id*. at 22, 41).

Having received the plea agreements, the Court proceeded on the record, at 10:44 a.m., confirming that the case had resolved and that both defendants intended to proceed with a change of plea hearing at that time. (*Id*. at 3-4). The Court then held Rule 11 plea colloquies with each defendant, beginning first with co-Defendant Washington III, followed by Defendant's plea colloquy immediately after. (*Id*. at 5, 29). Both defendants remained in the courtroom throughout the entirety of each other's plea colloquies.

The Court began Defendant's colloquy by confirming that Defendant was indeed ready to proceed. (*Id*. at 29). The Court summarized and confirmed Defendant's

understanding of the statutory penalties applicable to Count 2 and the proposed binding sentence, as set forth in the plea agreement. (*Id*.) The Court also asked Defendant about the status of his mental health and whether he had taken all of his medication. (*Id*. at 30-32). Defendant confirmed unequivocally that he had taken his prescribed mental health medication and had a clear head. (*Id*. at 31-32).[6] Moreover, upon the Court's inquiry, defense counsel expressed no concern regarding Defendant's competency to proceed with the plea colloquy. (*Id*. at 32).

The Court further advised Defendant of his applicable constitutional rights and ensured Defendant's understanding that the decision to plead guilty would constitute a waiver of those rights. (*Id*. at 32-33). The Court further confirmed Defendant's awareness and understanding of the sentencing guidelines, the presentence investigation report process, the statutory factors the Court must consider at the time of sentencing, and the sentencing impact of his Rule 11(c)(1)(C) plea agreement. (*Id*. at 34-36).

---

[6] To be clear, Defendant explained that: "two days before I got locked up, I had an appointment to go to Christ Hospital … I was supposed to get more medicine, like anxiety and pain medicine, because I got [] shot with an AK and I got rods and stuff in my leg and all that." (Doc. 64 at 31). The anxiety and pain medication is distinct, however, from Defendant's <u>mental health medication</u>, which this Court has consistently ensured Defendant receive in the county jail. Indeed, on April 14, 2018, the Court instructed the U.S. Marshals to confirm with the county jail that Defendant has been given, and has actually taken, his mental health medication as prescribed. The Marshals confirmed that Defendant has indeed been taking his two oral medications nightly and that he had been receiving his monthly injection, the last of which was administered on April 12, 2018. The Court further instructed that the county jail shall report immediately if Defendant fails to take his medication for any reason. The only lapse occurred on April 14, 2018, when Defendant refused to take his nightly medication. The county jail reported that this was the first and only time Defendant had ever refused his medication, and that he voluntarily resumed taking it the next day. Moreover, during the final pretrial conference, defense counsel confirmed that Defendant was taking his prescribed medications. Further, during the plea colloquy, Defendant repeatedly confirmed that he was taking all of his medication, as prescribed. (*Id*. at 31-32).

The Court then asked the Government to summarize the plea agreement, paragraph-by-paragraph and to read the attached Statement of Facts in full. (*Id*. at 36). The Court ensured that Defendant had a copy of his plea agreement before him and was therefore able to follow along with the written document. (*Id*. at 34, 36).

Notably, paragraph 15 of the plea agreement, which the Government thoroughly summarized, states as follows:

> The Defendant acknowledges that he has read and understands this plea agreement; that he accepts this plea agreement knowingly and voluntarily and not as a result of any force, threats, or promises, other than the promises in this plea agreement; that he has conferred with his attorney regarding this plea agreement and the facts and circumstances of his case, including the applicable law and potential defenses, and that he is fully satisfied with the representation, advice, and other assistance of his attorney in this case.

(Doc. 55 at 5, ¶ 15). The plea agreement further states: "I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, I voluntarily agree to it, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney." (*Id*. at 5). The statement is followed by Defendant's signature. Similarly, before defense counsel's signature, the plea agreement states, in relevant part: "I have carefully reviewed every part of this agreement with [Defendant]. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one." (*Id*. at 6).

Upon the conclusion of the Government's summary and reading of the plea agreement and Statement of Facts, the Court ensured Defendant's understanding of the terms of the agreement and specifically noted the appellate waiver. (Doc. 64 at 41-42).

7

The Court also confirmed that Defendant had carefully read the Statement of Facts and that it was true, as written, in its entirety. (*Id*. at 42).

Finally, the Court inquired as to the voluntariness of Defendant's plea, as follows:

> THE COURT: So are you offering to plead guilty because you're, in fact, guilty of the offense?
>
> DEFENDANT NO. 2 "Man": Yes.
>
> THE COURT: Has anybody threatened you or forced you to plead guilty?
>
> DEFENDANT NO. 2 "Man": No, sir.
>
> THE COURT: Anything I've done that's making you plead guilty?
>
> DEFENDANT NO. 2 "Man": No, sir.
>
> THE COURT: You've talked with your lawyer fully about this; correct?
>
> DEFENDANT NO. 2 "Man": Yes, sir.
>
> THE COURT: And you believe your lawyer is fully informed about the facts and circumstances on which the charge is based?
>
> DEFENDANT NO. 2 "Man": Yes.
>
> THE COURT: And are you fully satisfied with your lawyer's representation and counsel?
>
> DEFENDANT NO. 2 "Man": Yes, sir.
>
> THE COURT: Very well. So is your decision to plead guilty your own free and voluntary act?
>
> DEFENDANT NO. 2 "Man": Yes.

THE COURT: Very well. Well, in light of everything I have told you about your rights and in light of the questions I've asked you, I'm going to ask you again for the last time, how do you plead to the charge in Count 2 of the Indictment: guilty or not guilty?

DEFENDANT NO. 2 "Man": Guilty.

(*Id*. at 43-44).

The Court then accepted Defendant's plea of guilty, stating:

This Judge has had the chance to observe the appearance and responsiveness of [Defendant] in giving his answers to the questions asked. Based on this Judge's observation and his answers as given, the Court is satisfied that [Defendant] is in full possession of his faculties. He's not suffering from any apparent physical or mental illness. He's not under the influence of narcotics or alcohol. He understands the proceeding in which he is engaged. He understands the nature and meaning of the charge and the consequences of his plea of guilty.

The Court therefore finds that [Defendant] is competent, fully, and capable of entering an informed plea. The Court further finds that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact, containing each of the essential elements of the offense charged.

The Court accepts the plea and makes a finding of guilty. The Court defers potential acceptance of the proposed binding Plea Agreement until I've received the presentence report and had a chance to review it and share it with counsel.

(*Id*. at 44).

In short, the Court found Defendant responsive, alert, fully engaged, and entirely competent throughout the entirety of his colloquy and the remainder of the hearing. Moreover, throughout the entirety of the hearing, but prior to the Court's acceptance of Defendant's guilty plea, the proposed binding range of 120 to 188 months (which the

Court repeatedly simplified as "15 and two-thirds years") was referenced **at least 20 times**. (*Id*. at 6-44). And, in response to the Court's direct inquiries, Defendant acknowledged the proposed binding range of 10 years up to "15 and two-thirds years" on three separate occasions. (*Id*. at 29, 34, 41-42).

On Friday, August 10, 2018, Defendant wrote a letter to the Court, stating his intent to withdraw his guilty plea. (Doc. 70, Att. 3). The Court emailed a copy of the letter to the Government and defense counsel on August 13, 2018.

In his letter to the Court, Defendant alleged that his defense attorney (Mr. Dutta), as well as Defendant Washington III's attorney (C. Ransom Hudson), "coerced" Defendant into the plea agreement. (*Id*.) Specifically, Defendant claimed: "[I] sign[ed] the plea deal solely under the idea, which was explained that way to me, that I would be getting an agreed sentence of up to 120 months (10 years), and under the threat that if I didn't sign it, my brother would get 65 years." (*Id*.) Defendant further stated: "[S]ince I am in fact a mental patient, I feel my attorney took advantage of my mental instability and gave me misinformation to get me to sign a plea deal in a case I originally and still want to go to trial for." (*Id*.) Accordingly, Defendant requested "immediate dismissal of the plea deal …." (*Id*.)

On August 17, 2018, for reasons entirely unrelated to Defendant or the instant case, the Court granted Mr. Dutta leave to withdraw as counsel and appointed CJA attorney Paul Laufman, Esq. to represent Defendant going forward. (Doc. 63). The Court provided a copy of Defendant's letter to Mr. Laufman as well. Thereafter, Mr. Laufman sought two continuances in order to afford him adequate time to review the

discovery and to confer with his client.  (Minute Entries & Notation Orders, Aug. 17, 2018 and Sep. 14, 2018).  On November 18, 2018, Mr. Laufman filed the instant motion on Defendant's behalf, thereby formalizing Defendant's written request to the Court seeking to withdraw his guilty plea.  (Doc. 67).

## II.  STANDARD OF REVIEW

"A guilty plea is valid if it is entered knowingly, voluntarily, and intelligently by the defendant."  *United States v. Dixon,* 479 F.3d 431, 434 (6th Cir. 2007) (citing *Brady v. United States,* 397 U.S. 742, 748 (1970)).  To ensure the validity of a plea, the Court must conduct a colloquy, pursuant to Fed. R. Crim. P. 11(b), and "verify that [the] defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged."  *Dixon,* 479 F.3d at 434 (quoting *United States v. Webb,* 403 F.3d 373, 378–79 (6th Cir. 2005)).  If the Court "scrupulously follow[s] the required procedure [under Rule 11], the defendant is bound by his statements in response to that court's inquiry."  *Ramos v. Rogers,* 170 F.3d 560, 566 (6th Cir. 1999) (quoting *Baker v. United States,* 781 F.2d 85, 90 (6th Cir. 1986)).

Withdrawal of a valid guilty plea "is not an absolute right but is a matter within the broad discretion of the district court."  *United States v. Sullivan*, 751 F. App'x 799, 807 (6th Cir. 2018) (quoting *United States v. Kirkland*, 578 F.2d 170, 172 (6th Cir. 1978) (per curiam)).  Thus, after the Court has accepted a defendant's plea of guilty, it may be withdrawn prior to sentencing only if the defendant "can show a fair and just reason for

requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "The purpose of Rule 11(d) is to allow a 'hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.'" *Dixon*, 479 F.3d at 436 (quoting *United States v. Alexander,* 948 F.2d 1002, 1004 (6th Cir. 1991)).

In determining whether the defendant has shown "a fair and just reason" to withdraw his plea, the Court must consider:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*Sullivan*, 751 F. App'x at 807–08 (quoting *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994)). "No one factor controls; … [t]he relevance of each factor will vary according to the 'circumstances surrounding the original entrance of the plea as well as the motion to withdraw.'" *United States v. Jackson*, 751 F. App'x 749, 751 (6th Cir. 2018) (quoting *United States v. Triplett*, 828 F.2d 1195, 1197 (6th Cir. 1987)).

### III. ANALYSIS

In his motion to withdraw his plea, Defendant argues that his decision to plead guilty was made under stressful and coercive circumstances, all of which only further

aggravated the state of his mental health. (Doc. 67 at 2-3, 7-9). Defendant further asserts
that the Court did not adhere to the procedural safeguards outlined in Dr. Dwyer's
competency evaluation, and that defense counsel was ineffective for allowing Defendant
to enter into the plea agreement and plead guilty under such circumstances, without
accounting for Defendant's mental health. (*Id*.)

Notably, however, in his *pro se* letter to the Court, Defendant asserts his intent to
withdraw his plea for slightly different reasons. (Doc. 70, Att. 3). Specifically,
Defendant states in his letter that his attorney took advantage of his mental health issues
to coerce him into signing a plea agreement that Defendant was allegedly misled by
counsel to believe called for a sentence of 120 months (not 120 to 188 months). (*Id*.) In
short, while Defendant's letter *does* raise issues of coercion and his mental health,
Defendant's <u>sole complaint</u> is ultimately that he was allegedly misled into believing he
would be guaranteed a lower sentence—*i.e.*, 120 months.

As fully explained below, the Court finds that Defendant entered into the plea
agreement and entered his plea of guilty knowingly, voluntarily, and with a full
understanding of the consequences. The Court further finds that Defendant's plea was
not a "hastily entered plea made with unsure heart and confused mind," but rather a fully
informed decision that Defendant ultimately came to second-guess weeks later. *Dixon*,
479 F.3d at 436 (quoting *Alexander,* 948 F.2d at 1004). Thus, permitting withdrawal of
Defendant's plea would not serve the intended purpose of Rule 11(d), and Defendant has
failed to "show a fair and just reason for requesting the withdrawal." *Id*.; Fed. R. Crim.
P. 11(d)(2)(B). Accordingly, Defendant's motion must be denied.

13

## A. The Time Between the Plea and the Motion to Withdraw

"The shorter the delay, the more likely a motion to withdraw will be granted, and a defendant's reasons for filing such a motion will be more closely scrutinized when he has delayed his motion for a substantial length of time." *United States v. Ellis*, 470 F.3d 275, 281 (6th Cir. 2006) (quoting *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996)).

Here, Defendant first voiced his intent to withdraw his plea in his *pro se* letter to the Court, dated August 10, 2018—over three and a half months (or 109 days) after his plea hearing.[7] The Sixth Circuit has "consistently found shorter periods [(*e.g.*, 77-days, 67-days, 36-days)] to be excessive." *See United States v. Martin*, 668 F.3d 787, 795 (6th Cir. 2012) (collecting cases).

The first factor weighs against withdrawal.

## B. Reason for Failing to Move to Withdraw Earlier

At the time of the change of plea hearing, Mr. Dutta served as counsel on behalf of Defendant. Thereafter, Mr. Dutta accepted employment with the Federal Public Defender's Office, thereby prompting him to move to withdraw as counsel. (Doc. 62).

Defendant now argues that "[he] promptly advised [Mr. Dutta] of his desire to withdraw his plea … [and that by] no fault of either [Defendant] or [Mr. Dutta], any follow-through on his request was stymied by [Mr. Dutta's] acceptance of new employment." (Doc. 67 at 5). Additionally, Defendant's motion includes a Declaration

---

[7] Although the formal motion to withdraw his plea was not filed until November 2018, in fairness to Defendant, the Court will utilize the date of Defendant's earliest communication in assessing the timing of his request.

from Mr. Dutta, stating that: "[Defendant] expressed to me his desire to withdraw his guilty plea when I met with him at the jail where he was held, within a matter of approximately three weeks following the plea hearing. His desire to do so increased and strengthened as the days and weeks passed." (Doc. 67-1 at 2). In other words, on or around May 14, 2018 (*i.e.*, three weeks after the change of plea hearing), Defendant expressed a desire to withdraw his plea to his attorney, Mr. Dutta. And as Mr. Dutta further states, the conversation regarding withdrawal of Defendant's guilty plea continued over the subsequent "days and weeks," during which time Defendant grew more adamant that he wants to withdraw his plea.

As an initial matter, the Court finds no relevant correlation between Mr. Dutta's withdrawal as counsel and the delay in Defendant's request to withdraw his plea. Specifically, Mr. Dutta did not move to withdraw as counsel until August 14, 2018— three months after Defendant first discussed withdrawing his plea with counsel (on May 14, 2018) and nearly four months after Defendant actually entered his guilty plea (on April 23, 2018). The length of time between Defendant's first discussion with Mr. Dutta regarding withdrawal of his plea, and Mr. Dutta's ultimate withdrawal as counsel, belies the assertion that Mr. Dutta's departure delayed Defendant's motion to withdraw his plea.

Moreover, as Mr. Dutta states in his Declaration, he and Defendant continued to have ongoing discussions regarding the withdrawal of Defendant's guilty plea for "days and weeks" after their May 14, 2018 meeting. However, there is no indication that, during this time, Mr. Dutta refused to file a motion to withdraw Defendant's plea, nor that Mr. Dutta delayed or thwarted Defendant's effort to withdraw his plea.

15

Finally, and most notably, on August 10, 2018, Defendant sent this Court a *pro se* communication expressing his intent to withdraw his plea. In fairness to Defendant, it is that very communication that the Court now relies on to the mark the date on which Defendant "moved" to withdraw his guilty plea (as opposed to the date of the formal motion). In other words, Defendant demonstrated that he was capable of making his intention known to the Court—and indeed he did so four days <u>before</u> his attorney moved to withdraw as counsel. Thus, even if Mr. Dutta had refused to file a motion to withdraw Defendant's guilty plea from May to August 2018, and if Defendant was adamant in his intent to withdraw his plea, Defendant could have sent the communication to the Court much earlier. But Defendant did not.

Thus, the Court is unpersuaded that there is any rationale for the 109-day delay, other than Defendant weighing his options with counsel before making a calculated decision to withdraw his plea. Accordingly, the second factor weighs against withdrawal.

## C. Whether Defendant has Asserted or Maintained his Innocence

At the time of his arraignment, Defendant entered a not guilty plea and, although Defendant engaged in pretrial plea negotiations, he did not withdraw his not guilty plea until the morning of *voir dire*. Accordingly, the Court views this pretrial phase as the time during which Defendant maintained his innocence.

Ultimately, however, Defendant entered into a written plea agreement that Defendant reviewed with his lawyer, read in full, and duly signed. (Doc. 55). Of note, the plea agreement states that, "Defendant agrees to plead guilty to Count 2 of the Indictment in this case … [and] **Defendant admits that he is, in fact, guilty of the**

16

**offense** and will so advise the Court." (*Id.* at 1, ¶ 1) (emphasis added). The plea agreement further states that, "[t]he parties agree to the Statement of Facts…," and the Statement of Facts is included as an attachment to the plea agreement and is also signed by Defendant. (*Id.* at 2, ¶ 7). Finally, the plea agreement memorializes Defendant's acknowledgement that he has read and reviewed the plea agreement with his lawyer, that Defendant is satisfied with his lawyer's advice and representation, and that Defendant accepts the plea agreement voluntarily and without coercion. (*Id.* at 5, ¶ 7). And in addition to the written plea agreement, the Court held a full colloquy with Defendant.

"Statements of guilt under oath at a plea hearing support the district judge's decision not to permit withdrawal." *Martin*, 668 F.3d at 796; *see also United States v. Mise*, 27 F. App'x 408, 414 (6th Cir. 2001) ("the guilty plea transcript reveals that the district court exhaustively inquired of Mise if he understood the factual basis for his plea, and whether he understood about the voluntariness of his guilty plea, and received repeated assurances from Mise that he understood both").

Here, during the change of plea hearing, Defendant was placed under oath and the Court held a thorough plea colloquy. (Doc. 64 at 28-45). During the colloquy, Defendant repeatedly admitted that he was in fact guilty of the conduct as alleged in Count 2 and that his admission of guilt was entirely truthful and voluntary. (*Id.* at 30, 34, 42, 43, 44). Specifically, the Government read the entirety of the Statement of Facts, out loud, into the record, after which the Court held the following colloquy with Defendant regarding the Statement of Facts:

17

> THE COURT: Mr. Washington, you read this before you signed it?
>
> DEFENDANT: Yes.
>
> THE COURT: **Is what's stated here correct?**
>
> DEFENDANT: **Yes.**
>
> THE COURT: Is it in any way incorrect?
>
> DEFENDANT: No, it's correct.

(*Id*. at 42) (emphasis added).

The Court further inquired as to Defendant's admission of guilt, as follows:

> THE COURT: So are you offering to plead guilty because you're, in fact, guilty of the offense?
>
> DEFENDANT: Yes.

(*Id*. at 43).

Following the Court's thorough colloquy, Defendant unequivocally entered his guilty plea to the offense. (*Id*. at 44).

Moreover, as the Government notes in its response in opposition, Defendant has also made post-plea statements maintaining or implying his guilt, including to the Probation Officer during his Presentence Investigation and during recorded jail calls with his family. (Doc. 70 at 7). Even in Defendant's letter to the Court, Defendant states his desire to withdraw his plea due to his alleged misunderstanding of the agreed upon sentencing range—but at no point does Defendant assert his innocence.

In short, although Defendant initially entered a not guilty plea and intended to proceed to trial, the Court finds that Defendant's unequivocal admission of guilt, under

oath, at the change of plea hearing, weighs heavily against him in consideration of the third factor. *See Mise*, 27 F. App'x at 414 ("'[t]he defendant's post plea claims of innocence mock his courtroom declarations of guilt under oath and at a time when the trial would proceed on the next day and during which he would have had the opportunity to challenge the credibility of the witnesses he raises in his letter'"). Moreover, Defendant maintained his guilt thereafter—or at the very least failed to assert his innocence—prior to the formal filing of the motion to withdraw his plea.

Accordingly, the Court finds that this factor weighs against withdrawal of Defendant's plea.

### D. The Circumstances Underlying the Entry of the Guilty Plea

When the Court "scrupulously follow[s] the required procedure [under Rule 11], the defendant is bound by his statements in response to that court's inquiry." *Ramos*, 170 F.3d at 566 (quoting *Baker*, 781 F.2d at 90). Moreover, a defendant's affirmative responses to the Court are sufficient to establish that the defendant pled guilty knowingly and voluntarily. *See United States v. Gardner*, 417 F.3d 541, 544 (6th Cir. 2005) ("[T]here is no requirement that in order to rely on a defendant's answer in a guilty-plea colloquy to conclude that the defendant pleaded guilty knowingly and voluntarily, those answers must be lengthy and all-encompassing; a straight-forward and simple 'Yes, your honor,' is sufficient to bind a defendant to its consequences." (quoting *United States v. Walker*, 160 F.3d 1078, 1096 (6th Cir. 1998))).

Here, there is no question that the Court conducted a thorough Rule 11 colloquy, and that Defendant was wholly responsive to the Court's inquiries.

Nonetheless, Defendant now asserts that, on the morning of trial, Defendant was effectively coerced into entering a guilty plea, in order to spare his brother/co-defendant from proceeding to trial. (Doc. 67 at 7). Specifically, the Government's final plea offer, which Defendant accepted on the morning of *voir dire*, was contingent upon <u>both</u> defendants' acceptance. Thus, Defendant asserts that, "[w]ith family in the building, [Defendant] was under intense pressure to make a decision that would not only affect his freedom, but that of his brother[.]" (*Id.*)

Additionally, Defendant argues that his known mental health issues were aggravated by the timing and stress under which he accepted the plea agreement and entered his guilty plea. (*Id.* at 7-9). Defendant further argues that the Court and defense counsel failed to follow Dr. Dwyer's procedural safeguards—specifically, to provide adequate time and take more frequent breaks, clearly summarize key concepts, and ensure Defendant remembers the agreement he enters into by having him recite components from memory. (*Id.*) Defendant argues that his counsel was ineffective for failing to account for Defendant's mental health issues and that, "[i]f his previous counsel had been able to go over the plea deal in detail with [Defendant], he likely would not have pleaded guilty that morning." (*Id.* at 9).

As an initial matter, Defendant's assertions as to the time constraints are vastly overstated. On the morning of *voir dire*, Defendant was given **<u>over two hours</u>** in the courtroom to review and consider the plea agreement (which is, in substance, a mere five-pages). And despite the fact that prospective jurors were waiting in the jury office for the commencement of *voir dire*, the Court never rushed or prodded the parties in any manner.

Indeed, chambers staff (who were present in the courtroom but well outside of earshot during the negotiations) repeatedly assured the parties that they could take as much time as they needed.

Additionally, as the Government evidences in its response in opposition, Defendant was actually given the exact same offer on April 4, 2018—nearly **three-weeks** before he accepted it on April 23, 2018. (Doc. 70, Att. 1). At the time the offer was originally extended, Defendant opted to continue negotiations in hopes of a more favorable deal, but to no avail. (*Id.*) Ultimately, after further negotiations, and after more than two hours of final consideration on the morning of *voir dire*, Defendant decided to take the deal.

Accordingly, the Court finds that Defendant was not coerced into making a hasty decision with little time for proper consideration. Defendant was given ample time to consider the deal and, only upon the realization that there was no better offer to be had, did Defendant make the deliberate and considered decision to accept the plea agreement.

As to the state of Defendant's mental health, the Court took every reasonable step to follow Dr. Dwyer's procedural safeguards. As previously noted, *see* fn. 6 *supra*, the Court contacted the Marshals weeks in advance of trial to ensure that Defendant was receiving and taking all of his medication, as prescribed. The Court further inquired of defense counsel as to Defendant's mental health and medication during the final pretrial conference, and spent considerable time ensuring that there were procedures in place to accommodate Defendant's mental health needs. And finally, during the plea colloquy, the Court observed Defendant's appearance and responsive first-hand, and also

repeatedly asked Defendant about his mental state, his adherence to his prescribed medication, and his understanding of the proceedings. At all times during the colloquy, Defendant was entirely engaged and responsive, and he gave no indication that he lacked a full understanding of the circumstances, nor did he imply or appear to be in a state of mental distress.

Further, it bears noting that because the Court conducted the plea colloquy for both defendants in the same proceeding, Defendant was present in the courtroom and heard the colloquy first as to co-Defendant Washington III. In other words, Defendant had the opportunity to witness the proceeding, to hear the questions once before he was required to answer to them, and to further consider his decision to engage in a similar colloquy.

At the time of Defendant's colloquy, the Court—despite having already been advised as to the status by the U.S. Marshals—specifically engaged Defendant in a discussion of his medication and mental health as follows:

> THE COURT: Have you ever been treated for any mental illness?
>
> DEFENDANT: Yes, Sir.
>
> …
>
> THE COURT: Are you taking medication currently?
>
> DEFENDANT: Yes.
>
> THE COURT: Tell me what you're taking.
>
> DEFENDANT: [Lists psychotropic medication]. ….
>
> THE COURT: I remember that medication was important for you, and we worked hard to get you --

22

DEFENDANT: Yeah. They tried to give me something in jail, but it didn't work out for me. It made me throw up and --

THE COURT: But while you've been locked up, you have been take taking some medication?

DEFENDANT: **Oh, yeah. I take my regular meds, my [psychotropic medication] and all that.**

THE COURT: I will ask the authorities to check out your [pain-related] medical condition. Okay?

DEFENDANT: Okay.

THE COURT: **But currently for mental health, you know, you get the shot and you get your medicine; right?**

DEFENDANT: **Yes, uh-huh.**

THE COURT: Okay.

DEFENDANT: Yes.

…

THE COURT: All right. I have to ask these questions. **So you've got a clear head today; right?**

DEFENDANT: **Yes.**

…

THE COURT: All right. Counsel, do you have any doubt as to his competency to enter his plea today?

MR. DUTTA: No, Your Honor.

(Doc. 64 at 30-32) (emphasis added). The Court also conducted its colloquy such that

Defendant would engage and confirm his understanding in response to each of the

Court's statements and inquiries. (*See id.* at 28-44).

23

The Court also specifically inquired as to the voluntariness of Defendant's plea, ensuring that Defendant's decision was made after full consideration and discussion with his attorney, and free of any threats, force, or coercion:

> THE COURT: So are you offering to plead guilty because you're, in fact, guilty of the offense?
>
> DEFENDANT: Yes.
>
> THE COURT: **Has anybody threatened you or forced you to plead guilty?**
>
> DEFENDANT: **No, sir.**
>
> THE COURT: Anything I've done that's making you plead guilty?
>
> DEFENDANT: No, sir.
>
> THE COURT: **You've talked with your lawyer fully about this; correct?**
>
> DEFENDANT: **Yes, sir.**
>
> THE COURT: And you believe your lawyer is fully informed about the facts and circumstances on which the charge is based?
>
> DEFENDANT: Yes.
>
> THE COURT: And are you fully satisfied with your lawyer's representation and counsel?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Very well. **So is your decision to plead guilty your own free and voluntary act?**
>
> DEFENDANT: **Yes.**
>
> THE COURT: Very well.

(*Id*. at 43) (emphasis added).

In short, during the plea colloquy, Defendant unequivocally represented to the Court that: he was not suffering from any untreated mental illness, that he was taking all of his mental health medication, that he had a clear head, that he had thoroughly discussed with his attorney the charges, the option of proceeding to trial, the plea agreement and the decision to plead guilty, that he believed his attorney was fully informed about the facts and circumstances of his case and that he was satisfied with his attorney's representation, and that his decision to plead guilty was entirely voluntary and not the result of any force, threats, or coercion. (*Id.* at 30-33, 43).[8]

Ultimately, having engaged in a thorough Rule 11 colloquy, the Court concluded:

> This Judge has had the chance to observe the appearance and responsiveness of [Defendant] in giving his answers to the questions asked. Based on this Judge's observation and his answers as given, the Court is satisfied that [Defendant] is in full possession of his faculties. He's not suffering from any apparent physical or mental illness. He's not under the influence of narcotics or alcohol. He understands the proceeding in which he is engaged. He understands the nature and meaning of the charge and the consequences of his plea of guilty.
>
> The Court therefore finds that [Defendant] is competent, fully, and capable of entering an informed plea. The Court further

---

[8] Additionally, Defendant's plea agreement, which Defendant signed, states that:

> Defendant acknowledges that he has read and understands this plea agreement; that he accepts this plea agreement knowingly and voluntarily and not as a result of any force, threats, or promises, other than the promises in this plea agreement; that he has conferred with his attorney regarding this plea agreement and the facts and circumstances of his case, … and that he is fully satisfied with the representation, advice, and other assistance of his attorney in this case.

(Doc. 55 at 5, ¶ 15).

> finds that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact, containing each of the essential elements of the offense charged.
>
> The Court accepts the plea and makes a finding of guilty.

(*Id*. at 44).

Accordingly, the Court finds that the circumstances of the plea were not coercive, that Defendant was not suffering from untreated mental illness nor was he in a state of mental distress or confusion, that Defendant had more than adequate time to fully review, discuss, and consider the plea offer, and that the Court followed the necessary safeguards to ensure Defendant's understanding. Therefore, the fourth factor weighs against allowing withdrawal of Defendant's plea.

### E. Defendant's Nature and Background

At the time of his plea, Defendant was 48 years old. (Doc. 64 at 30). He is a U.S. citizen, fully literate, and has completed his education through the twelfth grade. (*Id*.) Defendant does suffer from mental illness, for which he is on an extensive prescription regimen. However, as this Court has already fully discussed, Defendant was on his medication and the Court took all necessary steps to ensure that he was not in any form of diminished capacity leading up to trial and at the time of his plea hearing.

Additionally, it bears noting that the Court has had the opportunity to witness Defendant first-hand when he is not on his medication. Specifically, on July 7, 2017, the Court held a reasonable cause hearing regarding Defendant's motion for a competency evaluation. (Doc. 33). At the time of the hearing, Defendant was not receiving all of his medication, due to an issue at the Butler County Jail where Defendant was being detained

26

pretrial.  Following the hearing, the Court ordered a competency evaluation and, in its written Order, the Court specifically noted its own observations of Defendant:

> [A]t the hearing, the Court had the opportunity to hold a colloquy with Defendant and observe his demeanor firsthand. The Court noted during the hearing that Defendant appeared to have difficulty focusing on the questions and issues presented. Defendant also demonstrated rapid emotional fluctuations. The Court expressed concern that Defendant's cognitive abilities, coupled with his diagnosed mental health issues, may render it difficult for him to communicate effectively with his counsel.

(Doc. 32).  Thus, at the time of Defendant's change of plea hearing, the Court was in an ideal position to judge Defendant's demeanor and responsiveness.  And, as previously stated, during the plea hearing, the Court had no concerns as to  Defendant's competence or his mental state.

Accordingly, Defendant's nature and background weighs against withdrawal of the plea.

### F.  Degree of Defendant's Prior Experience with the Criminal Justice System

The instant case is certainly not Defendant's first interaction with the criminal justice system.  Of  note, however, Defendant has relatively few *convictions*, despite his lengthy criminal history.  This shortage of convictions can be attributed, at least in part, to many of Defendant's earlier criminal charges being dismissed after Defendant was found incompetent to stand trial.  However, since 2006, the question of competency has frequently been raised and, ultimately, Defendant has been found competent to stand trial or restored to competency.

In short, Defendant has sufficient experience with the criminal justice system to understand the consequences of a guilty plea, the option to proceed to trial, and the implications of a finding that he is not competent to stand trial.[9]

Accordingly, Defendant's prior experience with the criminal justice system weighs against withdrawal of his plea.

### G. Potential Prejudice to the Government if the Plea is Withdrawn

Defendant argues that there would be no prejudice to the Government if trial were to proceed, because all of the witnesses and evidence remain available. (Doc. 67 at 11). However, as the Government notes, the minor victims were incredibly difficult to locate, even prior to the April 23, 2018 trial date. (Doc. 70 at 12). In any event, even assuming the witnesses are available or can be located at this time, the excruciating emotion toll of having the victims testify, after having been told that the case is resolved, is in and of itself a significant hardship on the victims and, therefore, on the Government. That said, the Court recognizes that ensuring Defendant's right to confront witnesses is fundamental to a fair trial.

Accordingly, the Court finds this factor neutral, in that it neither weighs in favor of nor against Defendant.

---

[9] Defendant states in his motion that his criminal history, "is not the history of a sophisticated criminal who intends to game the system." (Doc. 67 at 10). The Court would merely note, however, that prior to the commencement of trial, the Court instructed the county jail and the U.S. Marshals to confirm Defendant's compliance with his prescription regimen and to advise the Court if Defendant stopped taking his medication. The Marshals confirmed that Defendant had always taken his two oral medications nightly and that he had been receiving his monthly injection. The only lapse occurred on April 14, 2018, when Defendant refused to take his nightly medication. **The county jail reported that this was the first and only time Defendant had ever refused his medication**. Defendant, however, voluntarily resumed taking it the next day.

## IV.  CONCLUSION

Based upon the foregoing, Defendant's motion to withdraw his guilty plea (Doc.

67) is **DENIED**.

**IT IS SO ORDERED.**

Date:   10/7/2021                          _s/Timothy S. Black_
                                           Timothy S. Black
                                           United States District Judge