## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-071 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| WILLIAM P. WASHINGTON, JR. (2), | : | |
| | : | |
| Defendant. | : | |

## ORDER DENYING DEFENDANT'S MOTIONS PURSUANT TO 28 U.S.C. § 2255

This criminal case is before the Court on Defendant William Pierce Washington, Jr.'s initial and amended motions to vacate his judgment and sentence, pursuant to 28 U.S.C. § 2255.  (Docs. 93, 103).[1]  Also before the Court is Defendant's Affidavit in support of his 2255 motion (Doc. 108), Defendant's memorandum in support of the motion (Doc. 109),[2] and the Affidavit of Frank J. Schiavone, III, Esq., who represented Defendant for purposes of sentencing (Doc. 115).

## I. BACKGROUND

On June 21, 2017, Defendant William Pierce Washington, Jr. and co-defendant, William Pierce Washington, III, were charged by way of a two-count indictment with:

---

[1] In his original 2255 motion, Defendant raised two due process claims and one claim of ineffective assistance of counsel.  (Doc. 93).  In his amended 2255 motion, Defendant excludes the due process claims and, instead, asserts what appear to be seven claims of ineffective assistance of counsel—some of which are entirely new claims while others incorporate the general arguments previously raised.  (Doc. 103).  Because it is not entirely clear whether Defendant intended the "Amended" 2255 to supersede the original 2255 or to supplement it, the Court will address all arguments separately.

[2] Defendant's memorandum also requests an evidentiary hearing.  (Doc. 109).  However, the Court finds that no hearing is warranted, as "the motion and the files and records of the case conclusively show that [Defendant] is entitled to no relief …."  28 U.S.C. § 2255(b).

conspiracy to sex traffic children, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c)

(Count 1); and sex trafficking of children, in violation of 18 U.S.C. § 1591(a)(1) and

(b)(2) (Count 2).  (Doc. 15).[3]  In sum, the charges alleged that from approximately

December 2016 through on or about April 18, 2017, Defendants conspired to and did

knowingly "recruit, entice, harbor, transport, provide, obtain, advertise, maintain,

patronize, and solicit" a sixteen-year-old female ("Minor Victim A"), knowing and in

reckless disregard of the fact that Minor Victim A had not attained the age of eighteen

and that she would be caused to engage in a commercial sex act.  (*Id.*)

At the commencement of the case, defense counsel, Soumyajit Dutta, Esq., raised

concerns regarding Defendant's competency to stand trial, in response to which this

Court held a hearing and ultimately granted the request for a competency evaluation and

report.  (Docs. 32, 33).  Specifically, the Court ordered that Defendant undergo a

competency evaluation at a suitable Bureau of Prisons ("BOP") facility and that the

evaluation report address, *inter alia*, whether Defendant is able to understand the nature

and consequences of the proceedings against him and to assist properly in his defense.

(Doc. 32 at 5).  Moreover, the Order specified that:

> Of particular interest to the Court is: (1) whether Defendant's
> current medications are appropriate and sufficient to provide
> him adequate treatment; (2) if Defendant is not competent to
> stand trial, whether he can be restored to competency; and (3)
> if Defendant meets the threshold for competency or is restored

---

[3] For clarity, the instant motion is brought by Defendant William Pierce Washington, Jr. a/k/a "Man" ("Defendant").  Defendant was charged in this case along with his co-defendant, William Pierce Washington, III a/k/a "Bam" ("Co-Defendant"; collectively with Defendant, the "Defendants").  Co-Defendant is Defendant's younger brother.  Additionally, the Government separately charged two defendants in related cases.

> to competency, and the case proceeds to trial, whether the Court should implement any procedural safeguards (*e.g.*, taking more frequent breaks) to ensure that, given Defendant's cognitive abilities, he is able to understand the proceedings and assist in his defense.

(*Id*. at 4).

Pursuant to the Court's Order, Defendant was committed to FCI Englewood, where Forensic Psychologist Jeremiah Dwyer, Ph.D., conducted Defendant's competency evaluation and prepared a thorough forensic competency report. (Doc. 35).[4] In sum, Dr. Dwyer opined that while Defendant's cognitive functioning was lower than average, it was not so low as to preclude competency and that Defendant was indeed competent to stand to trial. (*Id*. at 25).

Further, Dr. Dwyer opined that "deficits in [Defendant's] cognitive abilities can be alleviated by recognizing and accommodating [Defendant's] limitations." (*Id*.) And, in response to the Court's inquiry regarding the implementation of procedural safeguards, Dr. Dwyer made "suggestions [that] should minimize the potential impact of [Defendant's] limitations on his ability to proceed." (*Id*.)

Specifically, Dr. Dwyer suggested that the Court offer more frequent breaks, in order for Defendant to have time to regulate his emotional response to stressful circumstances, as well as to allow defense counsel additional opportunities to review new information and developments with Defendant. (*Id*. at 25-26). Dr. Dwyer also suggested that key concepts should be explained to Defendant in a basic manner, using simple

---

[4] As required pursuant to statute, 18 U.S.C. § 4247(c), Defendant's competency evaluation report was filed under seal (Doc. 35) and provided to counsel for both parties.

words, concrete examples, and written summaries. (*Id.* at 26). Dr. Dwyer further suggested slowing down proceedings, repeating information, allowing Defendant time to ask and answer questions, and "[e]nsuring [Defendant] remembers any legal agreement he is entering by having him recite basic, concrete components of the agreement from memory." (*Id.*) Finally, Dr. Dwyer noted the importance of ensuring that Defendant had access to and was taking all of his mental health medication, as prescribed. (*Id.*)[5]

After receiving and reviewing the competency evaluation report, the parties informed the Court that they concurred with Dr. Dwyer's assessment and opinions, and stipulated that a competency hearing was unnecessary. (Min. Entry, Oct. 19, 2017). Accordingly, the case proceeded and, after granting a number of continuances to allow the parties adequate time to prepare, the Court established a trial calendar, setting a final pretrial conference for April 17, 2018 and a jury trial to commence on April 23, 2018. (Doc. 37).

On the morning of April 23, 2018, the parties were present in the courtroom by 8:30 a.m., as instructed at the final pretrial conference, in order to address final matters with the Court before the commencement of *voir dire*. However, upon their arrival, the parties informed court staff that both defendants were re-considering a resolution by plea. Accordingly, the parties asked the Court to delay the pre-*voir dire* proceeding and *voir*

---

[5] Defendant's prescription regimen consists of three separate psychotropic medications, including two medications to be taken daily, as well as one monthly injection. (Doc. 35 at 4). To maintain privacy, the Court will not make specific reference to Defendant's mental health diagnosis or prescriptions, which information is detailed in the competency evaluation report. (*Id.*) Thus, any reference in this Order to Defendant receiving and/or taking his prescribed medication, refers specifically to the three psychotropic prescriptions.

*dire*, in order to allow them to make a final effort at resolving the case. The Court agreed and allowed the parties to remain in the courtroom to conduct their final plea discussions.[6] Prospective jurors remained in the jury room (entirely separate from the courtroom), and were advised only that there was some delay attributable to the Court (so as not to taint any prospective juror against the parties).

After two hours of further plea discussions, the parties presented the Court with two signed Rule 11(c)(1)(C) plea agreements, resolving the case as to each defendant. (Docs. 54, 55). Pursuant to Defendants' plea agreements—which agreements were identical in substance with the exception of the Statement of Facts—Defendants agreed to plead guilty to Count 2 of the Indictment, charging sex trafficking of children, and the parties further agreed that, upon acceptance of the Rule 11(c)(1)(C) plea agreement, "the Court may impose a sentence not to exceed one hundred and eighty-eight (188) months imprisonment." (*Id.* at 3). However, as Count 2 carries a mandatory minimum of ten years imprisonment, the agreement, in effect, called for a sentence, at the Court's discretion, within the range of 120 to 188 months. *See* 18 U.S.C. § 1591(b)(2). Additionally, the parties informed the Court that each defendant's plea agreement was contingent upon the plea agreement of the other co-defendant. (Doc. 64 at 22). That is, if either defendant failed to accept his plea agreement, the Government would have the right to withdraw from the co-defendant's plea agreement as well. (*Id.* at 22, 41).

---

[6] Because court proceedings had not yet commenced, the entirety of the communications between the parties and court staff, as well as the parties' plea discussions, occurred off the record.

Having received the plea agreements, the Court proceeded on the record, at 10:44 a.m., confirming that the case had resolved and that both defendants intended to proceed with a change of plea hearing at that time. (*Id*. at 3-4). The Court then held Rule 11 plea colloquies with each defendant, beginning first with Co-Defendant, followed by Defendant's plea colloquy immediately after. (*Id*. at 5, 29). Both defendants remained in the courtroom throughout the entirety of each other's plea colloquies.

The Court began Defendant's colloquy by confirming that Defendant was indeed ready to proceed. (*Id*. at 29). The Court summarized and confirmed Defendant's understanding of the statutory penalties applicable to Count 2 and the proposed binding sentence, as set forth in the plea agreement. (*Id*.) The Court also asked Defendant about the status of his mental health and whether he had taken all of his medication. (*Id*. at 30-32). Defendant confirmed unequivocally that he had taken his prescribed mental health medication and had a clear head. (*Id*. at 31-32).[7] Moreover, upon the Court's inquiry,

---

[7] To be clear, Defendant explained that: "two days before I got locked up, I had an appointment to go to Christ Hospital … I was supposed to get more medicine, like anxiety and pain medicine, because I got [] shot with an AK and I got rods and stuff in my leg and all that." (Doc. 74 at 31). The anxiety and pain medication is distinct, however, from Defendant's <u>mental health medication</u>, which this Court consistently ensured Defendant was receiving while in the county jail. Moreover, on April 14, 2018, in anticipation of trial, the Court instructed the U.S. Marshals to re-confirm with the county jail that Defendant was given, and had actually been taking, his mental health medication, exactly as prescribed. The Marshals confirmed that Defendant had indeed been taking his two oral medications nightly and that he was receiving his monthly injection, the last of which was administered on April 12, 2018. The Court then further instructed that the county jail shall report immediately if Defendant fails to take his medication for any reason. The only lapse in medication occurred on April 14, 2018, when Defendant refused to take his nightly medication. Notably, the county jail reported that this was <u>the first and only time</u> Defendant had ever refused his medication, and that he <u>voluntarily resumed taking it the next day</u>. Moreover, during the final pretrial conference, defense counsel confirmed that Defendant was taking his prescribed medications. Further, during the plea colloquy, Defendant repeatedly confirmed that he was taking all of his medication, as prescribed. (*Id*. at 31-32).

defense counsel expressed no concern regarding Defendant's competency to proceed with the plea colloquy. (*Id*. at 32).

The Court further advised Defendant of his applicable constitutional rights and ensured Defendant's understanding that the decision to plead guilty would constitute a waiver of those rights. (*Id*. at 32-33). The Court further confirmed Defendant's awareness and understanding of the sentencing guidelines, the presentence investigation report process, the statutory factors the Court must consider at the time of sentencing, and the sentencing impact of his Rule 11(c)(1)(C) plea agreement. (*Id*. at 34-36).

The Court then asked the Government to summarize the plea agreement, paragraph-by-paragraph, and to read the attached Statement of Facts in full. (*Id*. at 36). The Court confirmed that Defendant had a copy of his plea agreement before him and was therefore able to follow along with the written document during the reading of the Statement of Facts and the Government's paragraph-by-paragraph summary, which summary included, *inter alia*, the elements of the offense, the statutory penalties and mandatory restitution obligations, the proposed sentence of the Rule 11(c)(1)(C) agreement, Defendant's agreement to pay restitution as ordered by the Court, the waiver of appeal, and Defendant's knowing and voluntary acceptance of the plea agreement. (*Id*. at 34-42).

Notably, paragraph 15 of the plea agreement, which the Government thoroughly summarized, states as follows:

> The Defendant acknowledges that he has read and understands this plea agreement; that he accepts this plea agreement knowingly and voluntarily and not as a result of any force,

> threats, or promises, other than the promises in this plea
> agreement; that he has conferred with his attorney regarding
> this plea agreement and the facts and circumstances of his case,
> including the applicable law and potential defenses, and that he
> is fully satisfied with the representation, advice, and other
> assistance of his attorney in this case.

(Doc. 55 at 5, ¶ 15).

The plea agreement further states: "I have read this agreement and carefully reviewed every part of it with my attorney.  I understand it, I voluntarily agree to it, and I do not wish to change any part of it.  I am completely satisfied with the representation of my attorney." (*Id*. at 5).  This statement is followed by Defendant's signature.  Similarly, before defense counsel's signature, the plea agreement states, in relevant part: "I have carefully reviewed every part of this agreement with [Defendant].  He advises me that he understands and accepts its terms.  To my knowledge, his decision to enter into this agreement is an informed and voluntary one." (*Id*. at 6).

After the Government's summary of the plea agreement and reading of the Statement of Facts, the Court ensured Defendant's understanding of the terms of the agreement.  (Doc. 64 at 41-42).  The Court also confirmed that Defendant had carefully read the Statement of Facts and that it was true, as written, in its entirety.  (*Id*. at 42).

Finally, the Court inquired as to the voluntariness of Defendant's plea, ensuring that Defendant's decision was made after full consideration and discussion with his attorney, and free of any threats, force, or coercion, as follows:

> THE COURT: **<u>So are you offering to plead guilty because
> you're, in fact, guilty of the offense</u>?**
>
> DEFENDANT NO. 2 "Man": **<u>Yes</u>.**

THE COURT: **Has anybody threatened you or forced you to plead guilty?**

DEFENDANT NO. 2 "Man": **No, sir.**

THE COURT: Anything I've done that's making you plead guilty?

DEFENDANT NO. 2 "Man": No, sir.

THE COURT: You've talked with your lawyer fully about this; correct?

DEFENDANT NO. 2 "Man": Yes, sir.

THE COURT: And you believe your lawyer is fully informed about the facts and circumstances on which the charge is based?

DEFENDANT NO. 2 "Man": Yes.

THE COURT: And are you fully satisfied with your lawyer's representation and counsel?

DEFENDANT NO. 2 "Man": Yes, sir.

THE COURT: Very well. **So is your decision to plead guilty your own free and voluntary act?**

DEFENDANT NO. 2 "Man": **Yes.**

THE COURT: Very well. Well, in light of everything I have told you about your rights and in light of the questions I've asked you, **I'm going to ask you again for the last time, how do you plead to the charge in Count 2 of the Indictment: guilty or not guilty?**

DEFENDANT NO. 2 "Man": **Guilty.**

(*Id*. at 43-44) (emphasis added).

The Court then accepted Defendant's plea of guilty, stating:

> This Judge has had the chance to observe the appearance and responsiveness of [Defendant] in giving his answers to the questions asked. Based on this Judge's observation and his answers as given, the Court is satisfied that [Defendant] is in full possession of his faculties. He's not suffering from any apparent physical or mental illness. He's not under the influence of narcotics or alcohol. He understands the proceeding in which he is engaged. He understands the nature and meaning of the charge and the consequences of his plea of guilty.
>
> The Court therefore finds that [Defendant] is competent, fully, and capable of entering an informed plea. The Court further finds that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact, containing each of the essential elements of the offense charged.
>
> The Court accepts the plea and makes a finding of guilty. The Court defers potential acceptance of the proposed binding Plea Agreement until I've received the presentence report and had a chance to review it and share it with counsel.

(*Id.* at 44).

In sum, the Court found Defendant responsive, alert, fully engaged, and entirely competent throughout the entirety of his colloquy and the remainder of the hearing. And, having engaged in a thorough Rule 11 colloquy, the Court was entirely satisfied that Defendant was fully competent to enter his plea of guilty, that the plea was supported by an independent basis in fact as to each element of the offense, and that Defendant's plea was entered knowingly, voluntarily, and intelligently. (*Id.* at 44). Accordingly, the Court accepted Defendant's plea and made a finding of guilty, but deferred acceptance of the Rule 11(c)(1)(C) plea agreement pending the U.S. Probation Office's preparation and the Court's review of Defendant's Presentence Investigation Report ("PSR"). (*Id.*)

10

On Friday, August 10, 2018, Defendant wrote a letter to the Court, stating his intent to withdraw his guilty plea.  (Doc. 70, Att. 3).  The Court emailed a copy of the letter to the Government and defense counsel on August 13, 2018.

In his letter to the Court, Defendant alleged that his defense attorney (Mr. Dutta), as well as Co-Defendant's attorney (C. Ransom Hudson), "coerced" Defendant into the plea agreement.  (*Id*.)  Specifically, Defendant claimed: "[I] sign[ed] the plea deal solely under the idea, which was explained that way to me, that I would be getting an agreed sentence of up to 120 months (10 years), and under the threat that if I didn't sign it, my brother would get 65 years."  (*Id*.)  Defendant further stated: "[S]ince I am in fact a mental patient, I feel my attorney took advantage of my mental instability and gave me misinformation to get me to sign a plea deal in a case I originally and still want to go to trial for."  (*Id*.)

On August 17, 2018, for reasons entirely unrelated to Defendant or the instant case, the Court granted Mr. Dutta leave to withdraw as counsel and appointed CJA attorney Paul Laufman, Esq. to represent Defendant going forward.  (Doc. 63).  The Court provided a copy of Defendant's letter to Mr. Laufman as well.  Thereafter, Mr. Laufman sought two continuances in order to afford him adequate time to review the discovery and to confer with his client.  (Minute Entries & Notation Orders, Aug. 17, 2018 and Sep. 14, 2018).  On November 18, 2018, Mr. Laufman filed a formal motion for Defendant to withdraw his guilty plea.  (Doc. 67).  The motion was briefed in February 2019 (Doc. 71), and a corrected change of plea transcript was received in August 2019 (Doc. 74).

Following the filing of Defendant's motion to withdraw his plea, the case experienced additional delays relating to Defendant's health (Docs. 75, 76), substitution of the Guardian Ad Litem appointed on behalf of Minor Victim A, the status of Co-Defendant and the related defendants, COVID-19, more *pro se* correspondence, Defendant's two substitutions of counsel (Docs. 78, 79), *etc.*

On October 7, 2021, this Court entered an Order denying Defendant's motion to withdraw his plea. (Doc. 82). Notably, and as detailed in the analysis *infra*, in its Order denying Defendant's motion to withdraw his plea, the Court addressed many of the same arguments Defendant now raises in support of his 2255.

On December 29, 2021, Defendant retained Frank Schiavone, III, Esq. to serve as his defense counsel going forward. (Doc. 87). The Court held a status conference the same day and granted Mr. Schiavone's request for a continuance, in order to afford new counsel sufficient time to familiarize himself with the case prior to sentencing. (Min. Entry, Dec. 29, 2023).

On March 25, 2022, the case proceeded to sentencing. (Min. Entry, Mar. 25, 2022). Defendant was present with counsel, Mr. Schiavone. (*Id.*) Also, present were Mr. Healey on behalf of the Government, as well as Minor Victim A, who was accompanied by her appointed Guardian Ad Litem. (*Id.*) During the sentencing, the Court addressed each of Defendant's objections to the PSR, heard argument and allocution from the parties, and considered each of the relevant 18 U.S.C. § 3553(a) sentencing factors. (Min. Entry, Mar. 25, 2022). The Court ultimately accepted the proposed Rule 11(c)(1)(C) plea agreement and, accordingly, sentenced Defendant to a

term of 188 months imprisonment (*i.e.*, the high-end of the proposed range). (*Id.*) After the Court stated its anticipated sentence, neither party raised any objections in response to the Court's *Bostic* inquiry. (*Id.*) Thus, the Court finalized its sentence and advised Defendant of his right to appeal within 14 days of entry of the final judgment. (*Id.*) Following entry of the Judgment of Conviction (Doc. 91), Defendant did not file a notice of appeal.

On October 14, 2022, Defendant filed his original 2255 motion. (Doc. 93). Then, on November 21, 2022, Defendant filed an unprompted (and untimely) *pro se* Notice of Appeal to the Sixth Circuit. (Doc. 94); *United States v. William Washington, Jr.*, No. 22-4012 (6th Cir., Dec. 5, 2022). The Sixth Circuit initially continued Defendant's retained counsel (Mr. Schiavone) for purposes of appeal. (Doc. 105). However, on March 13, 2023, the Sixth Circuit *sua sponte* withdrew Mr. Schiavone as counsel, due to not having received any responsive communications or filings. (*Id.*) The Sixth Circuit served Defendant with a copy of its Order, which Order further advised Defendant that he may either retain new appellate counsel or, alternatively, that he may seek leave to appeal in forma pauperis so that counsel could be appointed on his behalf. (*Id.*) Defendant took no action in response to the Sixth Circuit's Order, nor to any of the Sixth Circuit's three subsequent letters, all of which expressly detailed Defendant's options for either retaining or seeking the appointment of appellate counsel. *Washington, Jr.*, No. 22-4012 (6th Cir., Docs. 6, 7, 8). Accordingly, on July 13, 2023, the Sixth Circuit dismissed Defendant's appeal for want of prosecution. (Doc. 111); *Washington, Jr.*, No. 22-4012 (6th Cir., Doc. 9, Jul. 7, 2023).

Additionally, on December 22, 2022 (*i.e.*, while Defendant's appeal was pending), Defendant filed his Amended 2255 with this Court. (Doc. 103). And on March 27, 2023 (*i.e.*, shortly after the Sixth Circuit withdrew appellate counsel, but months prior to the dismissal of his appeal), Defendant filed, in this Court, a sworn declaration in support of his 2255 (Doc. 108) and also filed his motion for an evidentiary hearing (Doc. 109).

Finally, on December 13, 2023, this Court entered a Notation Order, instructing Mr. Schiavone to submit an Affidavit, so as to provide the Court with relevant information regarding one of Defendant's ineffective assistance of counsel claims. (Not. Order, Dec. 13, 2023). The Notation Order also permitted Defendant to submit any relevant evidence on the same grounds. (*Id.*) On December 28, 2023, Mr. Schiavone submitted his Affidavit, as required. (Doc. 115). Defendant did not submit any additional evidence.

## II.  STANDARD OF REVIEW

A court must vacate and set aside a judgment or sentence if it finds "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). Accordingly, a motion for relief under § 2255 must allege either: "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185-86 (1979)). In

other words, "[r]elief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (quoting *Davis v. United States,* 417 U.S. 333, 346 (1974)). "Claims of ineffective assistance of counsel are appropriately brought … under section 2255." *Griffin*, 330 F.3d at 736.

## III.  ANALYSIS

In his original and Amended § 2255 motions, Defendant asserts a total of ten claims for relief, including two due process claims and eight claims of ineffective assistance of counsel.  (Docs. 93, 103).

As fully explained below, the Court finds no merit in any of Defendant's claims, and thus the § 2255 motions must be denied.  Additionally, and as previously stated, the Court notes that much of Defendant's claims are based upon arguments that this Court substantively addressed and rejected in resolving Defendant's motion to withdraw his plea.  (*See* Doc. 82).  In that regard, the Court will not entertain the re-litigation of these issues and will, instead, refer to or reiterate its prior findings, which findings the Court continues to stand by.

### A.  Due Process Claims

#### 1.  *Coercion to Enter Plea of Guilty (Ground 1 of Original 2255)*

Defendant asserts a denial of due process, arguing that his attorney, Mr. Dutta, as well as Co-Defendant's attorney, Ransom Hudson, Esq., "induced, coerced, threatened, and intimidated" him into pleading guilty, which in turn renders his plea void.  (Doc. 93 at 4).  Defendant further claims that, "[d]uring the plea colloquy the Court never asked

[Defendant] if he was pressured, induced, coerced, or intimidated by counsel prior to pleading guilty." (*Id*. at 14).

To start, it bears noting that, in its Order denying Defendant's motion to withdraw his plea, this Court thoroughly considered and unequivocally rejected Defendant's assertion that his plea was coerced. (Doc. 82 at 19-26). Indeed, as explained fully in the Court's prior Order, while Defendant ultimately accepted the plea on the morning of *voir dire*, that very plea offer was originally extended to him three weeks earlier. (*Id*. at 21). Significantly, Defendant spent those three weeks, attempting to negotiate a better deal, to no avail. (*Id*.) In other words, Defendant's current contention that counsel strong-armed him into entering a plea on the morning of trial is entirely without merit. Rather, Defendant was fully engaged in negotiations and actively considering a plea for weeks leading up to the trial. Thus, as this Court previously noted, it was "only upon the realization that there was no better offer to be had, did Defendant make the deliberate and considered decision to accept the plea agreement." (*Id*.)

Moreover, Defendant's assertion regarding the sufficiency of the Rule 11 plea colloquy is patently false, as amply evidenced by the plea colloquy transcript. (*See* Doc. 74). During the colloquy, the Court specifically inquired as to the voluntariness of Defendant's plea, ensuring that Defendant's decision was made after full consideration and discussion with his attorney, that his decision was free of any threats, force, or coercion, and that Defendant was fully satisfied with his attorney's advice and representation:

THE COURT: **So are you offering to plead guilty because you're, in fact, guilty of the offense?**

DEFENDANT NO. 2 "Man": **Yes.**

THE COURT: **Has <u>anybody</u> threatened you or forced you to plead guilty?**

DEFENDANT NO. 2 "Man": <u>**No, sir.**</u>

THE COURT: Anything I've done that's making you plead guilty?

DEFENDANT NO. 2 "Man": No, sir.

THE COURT: You've talked with your lawyer fully about this; correct?

DEFENDANT NO. 2 "Man": Yes, sir.

THE COURT: And you believe your lawyer is fully informed about the facts and circumstances on which the charge is based?

DEFENDANT NO. 2 "Man": Yes.

THE COURT: <u>**And are you fully satisfied with your lawyer's representation and counsel**</u>?

DEFENDANT NO. 2 "Man": <u>**Yes, sir.**</u>

THE COURT: Very well. <u>**So is your decision to plead guilty your own free and voluntary act**</u>?

DEFENDANT NO. 2 "Man": <u>**Yes.**</u>

(*Id*. at 43) (emphasis added).

Additionally, Defendant's plea agreement, which Defendant signed, and fully affirmed under oath, states that:

> Defendant acknowledges that he has read and understands this plea agreement; **that he accepts this plea agreement knowingly and voluntarily and not as a result of any force, threats, or promises, other than the promises in this plea agreement**; that he has conferred with his attorney regarding this plea agreement and the facts and circumstances of his case, … and that **he is fully satisfied with the representation, advice, and other assistance of his attorney in this case**.

(Doc. 55 at 5, ¶ 15) (emphasis added). And the same assurance is found immediately above Defendant's signature on the plea agreement, stating that: "I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, I voluntarily agree to it, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney." (*Id*. at 5) (emphasis added).

Based on Defendant's sworn statements during his plea colloquy, as well as the statements in his own plea agreement, the Court, once again, rejects the assertion that Defendant's plea was the product of coercion by counsel. Thus, relief is unwarranted under Ground 1 of the original 2255.

### 2. *Timing of Sentencing Hearing (Ground 2 of Original 2255)*

Defendant further asserts that the delay between his guilty plea and his sentencing hearing resulted in a denial of due process. (Doc. 93 at 5). Defendant does not provide any example of prejudice resulting from the delay, nor does Defendant account for the fact that his own filings and circumstances contributed to the delay.

The Supreme Court has held that the Sixth Amendment's Speedy Trial Clause does not apply to the sentencing phase of a criminal case (*i.e.*, after a defendant has been convicted at trial or entered a guilty plea), but that, "[f]or inordinate delay in sentencing,

although the Speedy Trial Clause does not govern, a defendant may have other recourse, including, in appropriate circumstances, tailored relief under the Due Process Clauses of the Fifth and Fourteenth Amendments." *Betterman v. Montana*, 578 U.S. 437, 439 (2016). To determine whether a sentencing delay gives rise to a due process violation, the Sixth Circuit utilizes the same factors as it would in considering a trial delay: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant." *United States v. Young*, 146 F. App'x 824, 832 (6th Cir. 2005) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Here, as to the first and second factors (*i.e.*, length and reason for the delay) Defendant entered his guilty plea on April 23, 2018, and he was sentenced on March 25, 2022. In the interim, however, Defendant expressed his intent to withdraw his plea (in August 2018) and, after the appointment of new counsel, Defendant filed a motion to withdraw his plea in November 2018, which motion was not fully briefed until February 27, 2019. (Docs. 67, 70, 71).

Additionally, in July and August 2019, Defendant experienced health complications, for which Defendant underwent surgery in September 2019. (*See* Docs. 75, 76). To ensure Defendant received appropriate treatment, the Court's staff worked with defense counsel (at the time, Paul Laufman, Esq.) to make all necessary medical arrangements, and the Court ordered Defendant's custodial transport to his initial doctor's appointments, surgery, and post-operative follow-ups, and the Court further ensured Defendant received continued medical care while in custody. (*Id.*)

Then, by March 2020, the COVID-19 pandemic delayed in-person proceedings. And the Court specifically opted not to hold Defendant's sentencing by video conference during this time, because the Court was mindful of Defendant's competency assessment and found that an in-person hearing would better facilitate communication and protect the safeguards suggested in the competency evaluation report. (*See* Doc. 35 at 25-26).

By the time the Court was able to hold in-person proceedings safely (late-2020), the Court was advised that Defendant intended to retain new counsel (largely through *pro se* communications), and in March 2021, Defendant retained, Jeffrey Brandt, Esq. (Doc. 78). Following communications with new counsel, the Court allowed Mr. Brandt time to prepare before proceeding to sentencing.

However, by July 2021, Mr. Brandt moved to withdraw as counsel (Doc. 79), and the Court was advised that Defendant was working to retain new counsel once again. After no new counsel was retained for some time, the Court set a hearing on Mr. Brandt's motion to withdraw in September 2021, during which hearing Defendant asked for more time to find new counsel. (Min. Entry, Sep. 29, 2021).

Defendant finally retained counsel, Mr. Schiavone, on December 29, 2021. (Doc. 87). The Court held a status conference that same day, and granted the defense's requested 90-day continuance, in order for Mr. Schiavone to get up to speed on the case. (Min. Entry, Dec. 29, 2021). During that conference, sentencing was set for March 25, 2022, and the Court proceeded with sentencing as scheduled. (*Id*.; Min. Entry, Mar. 25,

2022).  Thus, while the time between Defendant's plea and sentencing was lengthy, the delay was attributable to Defendant.[8]

Next, as to the third factor the Court must consider (*i.e.*, defendant's assertion of his right), Defendant did not ask the Court to hasten the scheduling of sentencing. Indeed, Defendant himself frequently requested to delay the proceedings (largely to accommodate changes in counsel).

Finally, as to the fourth factor (*i.e.*, prejudice to Defendant) while Defendant asserts a due process violation, he does not assert any specific prejudice.  Moreover, the Court cannot conclude that any prejudice arose from the Court's efforts to safeguard Defendant's mental and physical health, address Defendant's motion and *pro se* communications, accommodate Defendant's requests to retain new counsel, and provide defense counsel reasonable and necessary time to prepare prior to sentencing.

Accordingly, the Court finds no due process violation and denies Defendant's motion on this ground.

### B.  Ineffective Assistance of Counsel Claims

Defendant also asserts eight claims of ineffective assistance of counsel—including one in his original 2255 and seven in his Amended 2255.  (Docs. 93, 103).  The Court notes, however, that many of these claims are substantively interconnected and/or

---

[8] In addition, the Court needed to await the final report regarding restitution from the Minor Victim's Guardian Ad Litem, which report was submitted in April 2019.  (Doc. 72).  The Court then had to select and appoint a new Guardian Ad Litem in June 2019.  Further, the Court needed to accommodate the availability of all parties (including the out-of-state Minor Victim and the Guardian Ad Litem) when scheduling sentencing.  And while not directly attributable to Defendant, these additional circumstances naturally contributed to scheduling delays.

redundant.  Nevertheless, the Court will address each claim in turn, but will attempt to avoid redundancy by either referencing or incorporating other sections of this Analysis.

To demonstrate ineffective assistance of counsel, Defendant must make two showings: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The Court is not required to "approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id*. at 697.  Thus, if Defendant fails to satisfy either of the two prongs, his claim will fail.  *Id*.

Under the first prong of the *Strickland* test, Defendant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 688.  However, counsel's representation is deficient only where it falls "below an objective standard of reasonableness."  *Id*.  There is no "checklist for judicial evaluation of attorney performance," but rather "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  *Id*.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance …."  *Id*. at 689.  Thus, the *Strickland* analysis is not an opportunity to second-guess trial counsel's sound strategic decisions merely because they were unsuccessful.  *Id*.; *White v. McAninch*, 235 F.3d 988, 995 (6th Cir. 2000).  "[T]he purpose of the effective assistance guarantee of the Sixth Amendment … is simply to ensure that criminal defendants receive a fair trial."  *Strickland*, 466 U.S. at

689.  And, notably, "the Constitution guarantees competent counsel and a fair trial, not perfection."  *Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir. 2000); *Harrington v. Richter*, 562 U.S. 86, 110 (2011) ("*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney'") (quoting *Strickland*, 466 U.S. at 686).

Under the second prong of the *Strickland* test, Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Defendant does not have to show that "his counsel's deficient conduct more likely than not altered the outcome in the case."  *Goza v. Welch*, 579 F. App'x. 367, 370 (6th Cir. 2014).  Instead, the question "is whether counsel's errors were serious enough to deprive the [defendant] of a proceeding the result of which was 'reliable.'"  *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995) (quoting *Strickland*, 466 U.S. at 687).

Additionally, the Supreme Court has outlined the application of *Strickland* to cases involving alleged ineffective assistance with regard to guilty pleas:

> In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence….  The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, in order to satisfy the "prejudice" requirement, **the defendant must show that there is a reasonable probability that, but for counsel's errors, he would *not* have pleaded guilty and would have insisted on going to trial**.

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing

23

ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985) (emphasis added).

### 1. *Coercion and Refusal to File an Appeal (Ground 3 of Original 2255)*

Defendant once again argues that counsel coerced his guilty plea, but now further argues that his attorney "allowed [Defendant to] plead guilty to a crime that [Defendant] is actually innocent of committing," and "also refused to file a notice of appeal." (Doc. 93 at 7). It bears reiterating here that Defendant was represented by different attorneys during the pre-trial/plea phase and the sentencing phase of his case. Therefore, Defendant's claim here must logically refer to two different attorneys—first, trial counsel, Mr. Dutta, for the alleged coercion to plead; and, second, Mr. Schiavone, for not filing a notice of appeal.

### a. Claim as to Trial Counsel

The first half of Defendant's claim focuses on his trial counsel, Mr. Dutta. To start, this Court has already found that Defendant's plea was not the product of coercion—whether by counsel or anyone else. Moreover, the Court rejects Defendant's assertion that Mr. Dutta allowed Defendant to "plead guilty to a crime that he is actually innocent of committing." During Defendant's plea colloquy, Defendant repeatedly and

<u>unequivocally admitted his guilt</u> and <u>confirmed the truthfulness of the Statement of Facts</u>.[9]  The Court finds neither error nor prejudice in defense counsel's reliance on Defendant's sworn statements of guilt.  Defendant had the right to plead guilty and forego the uncertainty of a trial in exchange for a favorable binding plea (though admittedly not as favorable as Defendant would have liked).  And, under those circumstances, it would have been unethical and inappropriate for counsel to have disregarded Defendant's wishes and insisted on proceeding with a trial that Defendant was expressly asking to waive.[10]  Thus, to the extent the claim focuses on Mr. Dutta's pretrial and plea-related representation, the Court rejects Defendant's arguments once again.

### b.  <u>Claim as to Appellate Counsel</u>

In the same claim, Defendant further alleges that his attorney failed to file a notice of appeal, despite Defendant asking him to do so.  (Doc. 93 at 7, 15).  In this regard, the Court reiterates that, while Defendant does not specify the attorney, Defendant's

---

[9] It also bears noting that while Defendant faults his counsel for not proceeding with trial despite Defendant's alleged innocence, <u>Defendant also made a number of post-plea statements maintaining or implying his guilt</u>, including to the Probation Officer during his Presentence Investigation and during recorded jail calls with his family.  (*See* Doc. 70 at 7).  Indeed, even in Defendant's August 2019 letter to the Court asking to withdraw his plea, Defendant stated that his desire to withdraw his plea was due to his alleged misunderstanding of the agreed upon sentencing range—but at no point did Defendant assert his innocence.

[10] In fact, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  *Missouri v. Frye*, 566 U.S. 134, 145 (2012).  And here, despite his contentions to the contrary, Defendant has repeatedly assured the Court of his guilt in this case.  Nevertheless, even "[d]eclarations of innocence do not prove … that [a defendant] would not have accepted a guilty plea"  *Griffin v. United States*, 330 F.3d 733, 737-38 (6th Cir. 2003) (citing *North Carolina v. Alford,* 400 U.S. 25, 33 (1970)).

argument can only logically apply to Mr. Schiavone, who represented Defendant at the time of sentencing.

To prevail on this claim, Defendant must "demonstrate that, but for counsel's deficient performance, he would have appealed…." *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000). Notably, with regard to the first *Strickland* prong, a deficiency in counsel's performance can occur in one of two ways.

First, the Supreme Court has held that "a lawyer who <u>disregards specific instructions from the defendant to file a notice of appeal</u> acts in a manner that is professionally unreasonable." *Id.* at 477 (emphasis added). Thus, the Court must make a factual determination as to whether such "specific instructions" were conveyed prior to the 14-day appellate deadline. *Id.*; *see also Campbell v. United States,* 686 F.3d 353, 360 (6th Cir. 2012). In that regard, the Court must hold an evidentiary hearing "unless the record conclusively shows that the petitioner is entitled to no relief." *Id.* at 357.

Alternatively, even absent specific instruction to file a notice of appeal, a deficiency in performance arises if counsel fails to consult with a defendant about an appeal—*i.e.*, "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes"—despite counsel having reason to believe the defendant wants or would benefit from an appeal being taken. *Flores-Ortega*, 528 U.S. at 478, 480.

Specifically, the Supreme Court held that:

> [C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal **when there is reason to think** either (1) that <u>a rational defendant would want to appeal</u> (for

> example, because there are nonfrivolous grounds for appeal),
> or (2) that <u>this particular defendant reasonably demonstrated to
> counsel that he was interested in appealing</u>.

*Id.* at 480 (emphasis added). In short, even when a defendant has not specifically voiced

appellate intentions to counsel, the Court must still determine whether counsel breached a

duty to consult with the defendant about an appeal, which duty arises only if counsel

knew or reasonably should have known that the defendant would or should want to take

up an appeal. *Id.*

As to the second *Strickland* prong, if the Court determines that counsel's

performance was deficient <u>and that there is a reasonable probability the defendant would</u>

<u>have appealed but for counsel's deficient performance</u>, then prejudice is presumed. *Id.* at

483 ("denial of the entire judicial proceeding itself, which a defendant wanted at the time

and to which he had a right, [] demands a presumption of prejudice"). The Supreme

Court emphasized that it is a "critical requirement that counsel's deficient performance

must actually cause the forfeiture of the defendant's appeal." *Id.* at 484. Therefore, "[i]f

the defendant cannot demonstrate that, but for counsel's deficient performance, he would

have appealed, counsel's deficient performance has not deprived him of anything, and he

is not entitled to relief." *Id.*

The defendant's burden to show an actual deprivation is simple in instances where

counsel disregards specific instruction to file a notice of appeal. This is because "the

defendant, by instructing counsel to perfect an appeal, objectively indicated his intent to

appeal …." *Id.* at 485 (citing *Rodriquez v. United States*, 395 U.S. 327, 328 (1969)).

Conversely, where no consultation occurred at all, "a defendant must demonstrate that

there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Flores-Ortega*, 528 U.S. at 484. "[T]he question whether a given defendant has made the requisite showing will turn on the facts of a particular case." *Id*. at 485. For instance, "evidence that there were nonfrivolous grounds for appeal or that the defendant in question promptly expressed a desire to appeal will often be highly relevant …." *Id*.

Notably, while nonfrivolous claims may help to evidence a defendant's intent to appeal, a defendant is not required to identify meritorious issues in order to prevail. *Id*. at 486 ("it is unfair to *require* an indigent, perhaps *pro se,* defendant to demonstrate that his hypothetical appeal might have had merit before any advocate has ever reviewed the record in his case in search of potentially meritorious grounds for appeal"). This is so, regardless of the manner of deficiency, *i.e.*, ignoring specific instructions or failing to consult. *Id*. at 484.

In short, if the Court determines that "counsel's constitutionally deficient performance deprive[d] a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." *Id*.

### i. First Strickland Prong – Counsel's Performance

As to the first *Strickland* prong, the Court must determine whether Defendant specifically instructed counsel to file a notice of appeal. If the Court finds that no specific instruction was given, then the Court must consider whether—based on the totality of circumstances that counsel knew or reasonably should have known at the

time—counsel, nevertheless, had a duty to consult with Defendant about filing an appeal.[11]

For purposes of the Court's analysis, the Court has before it Defendant's statements in his original 2255 motion (Doc. 93 at 7, 15, 20) and in Defendant's sworn Affidavit (Doc. 108 at 3), as well as Mr. Schiavone's sworn Affidavit (Doc. 115).[12]

To start, and as previously noted, Defendant first raises the notice of appeal issue as part of a larger claim that he was coerced into pleading guilty, in which he simply states that "Counsel also refused to file a notice appeal when requested." (Doc. 93 at 7). Defendant's attached memorandum briefly elaborates on this assertion further, stating in full that:

> Shortly after sentencing, [Defendant] informed his attorney that he wished to appeal from final Judgment. Although

---

[11] As the Court explains, *infra*, Defendant makes contradictory claims as to whether counsel consulted with him about an appeal at all. And while Mr. Schiavone's Affidavit strongly implies that such a consultation occurred, it does not say so expressly. For instance, the Affidavit references counsel meeting with Defendant numerous times before and after sentencing, and also notes that Defendant appeared to understand the contours of the appellate waiver. (Doc. 115 at 2, ¶¶ 7, 9). While this suggests that a consultation likely occurred, the Court opts to err on the side of caution. Notably, specific instructions to file a Notice of Appeal need not be conveyed in the context of a formal consultation. And, in any event, whether a consultation occurred or not, Defendant fails to make the requisite showing in either instance. Given that the outcome of Defendant's claim is the same regardless, the Court need not make a definite factual finding in this regard. Rather, the Court will conduct its analysis as to both scenarios—*i.e.*, if specific instruction was given in any context (whether after a formal consultation or not) and also, assuming no consultation occurred, whether counsel had a duty to consult with Defendant.

[12] Neither Defendant nor Mr. Schiavone had any additional evidence to submit relevant to this particular claim. (*See* Not. Order, Dec. 13, 2023; Doc. 115 at 2, ¶ 12). Thus, the Court will conduct its analysis based on Defendant's and Mr. Schiavone's statements, which statements are memorialized on the record in Defendant's pleading and sworn Affidavit, as well as Mr. Schiavone's sworn Affidavit. (Doc. 93 at 7, 15, 20; Doc. 115). Given that everything the Court can and must consider is already of record, the Court finds that no evidentiary hearing is required, nor would a hearing serve any purpose or benefit in this instance.

> counsel was aware that [Defendant] wanted to appeal the sentence and conviction of the Court, Counsel, however, did not file a notice of appeal.
>
> Instead, Counsel informed [Defendant] that an appeal was problematic. The period of time of [Defendant's] appeal to be preserved came and went with no notice having been filed on his behalf. Counsel rendered ineffective assistance by failing to file a notice of appeal despite [Defendant's] request.

(*Id*. at 15, ¶¶ 12, 13). Defendant concludes his argument by again making this statement effectively verbatim. (*Id*. at 20). Notably, Defendant does not raise the notice of appeal again in his Amended 2255, nor in his supplemental memorandum/motion for evidentiary hearing. (Docs. 103 & 109). Indeed, the only other time Defendant mentions the notice of appeal is in the last paragraph of his sworn Affidavit, which reads: "Affiant states counsel never discussed the advantages or disadvantages of filing a notice to appeal the court sentence[ing] him 8 months outside the suggested advisory guideline and counsel should have 'consulted' within the 14 day window to appeal." (Doc. 108 at 3, ¶ 20).

Conversely, Mr. Schiavone states in his sworn Affidavit that, from the start of his representation until well after sentencing, he maintained constant contact with Defendant—speaking to him either in person or by telephone at least three times per week—and that Defendant never instructed him to file a notice of appeal. (Doc. 115 at 2, ¶¶ 7, 11).

Based on the information before the Court, as well as this Court's extensive experience with this case, the Court is entirely confident that Mr. Schiavone's statement is accurate. That is, the Court concludes that Defendant never instructed Mr. Schiavone to file a notice of appeal.

In reaching this conclusion, the Court first notes that, while Defendant claims to have specifically told counsel to file a notice of appeal, Defendant never even identifies Mr. Schiavone by name. This is particularly notable given that Mr. Schiavone was Defendant's most recent counsel and, as evidenced in the pleadings, Defendant has no trouble in recalling or identifying any of his other attorneys (indeed, he even names his Co-Defendant's attorney, Mr. Hudson). The Court therefore finds Defendant's recollection unreliable with regard to the purported conversation.

Additionally, Defendant's initial statement, contained in the original 2255 motion, was that he conferred with counsel and specifically discussed filing an appeal, but was allegedly told by his counsel that an appeal would be "problematic." (Doc. 93 at 15, 20). However, in his Affidavit, Defendant claims that "counsel never discussed the advantages or *disadvantages* of filing a notice of appeal … and counsel should have 'consulted' within the 14 day window to appeal." (Doc. 108 at 3, ¶ 20) (emphasis added). These two statements are patently inconsistent—*i.e.*, Defendant first claims that he conferred with counsel, specifically instructed him to file a notice of appeal, but that counsel advised him of a disadvantage (being "problematic"); whereas Defendant's second statement claims that counsel never conferred or advised him on an appeal at all. These inconsistencies, again, evidence that Defendant's recollection or retelling of the events is unreliable, at best.

Finally, the Court notes that Defendant did ultimately file a late *pro se* notice of appeal on November 21, 2022. However, Defendant's Judgment of Conviction was entered on May 27, 2022, which means that the 14-day appellate window lapsed on June

31

10, 2022. If counsel had, as Defendant alleges, disregarded specific instructions to file a timely notice of appeal, the Court questions why Defendant waited five months to file his own notice *pro se*. It further bears noting that, after filing his *pro se* notice of appeal, the Court of Appeals gave Defendant four separate opportunities over the next four months to either proceed *pro se*, retain new appellate counsel, or seek the appointment of appellate counsel. Defendant disregarded each of these opportunities, leading to the dismissal of his appeal for lack of prosecution. To this Court, Defendant's failure to pursue his (albeit untimely) appeal, whether *pro se* or through appointed or retained counsel, undermines his claim that he was adamant about appealing in the first instance.

In sum, the Court finds Defendant's account of the events to be unreliable, inconsistent, and incredible. On the other hand, Mr. Schiavone, an experienced officer of the Court, has provided this Court with a credible, sworn Affidavit, stating that Defendant never instructed him to file a notice of appeal. The Court relies entirely on Mr. Schiavone's statement. Accordingly, the Court finds that Defendant did not specifically instruct Mr. Schiavone to file a notice of appeal and, thus, Mr. Schiavone never disregarded any such instruction.

Having concluded that Defendant did not specifically instruct counsel to file a notice of appeal, the Court must consider whether, based on the totality of the circumstances, Mr. Schiavone nevertheless had a duty to confer with Defendant regarding an appeal and, if such a duty existed, whether the duty was breached.

As the Supreme Court has established, counsel has a duty to consult with a defendant regarding an appeal "**when there is reason to think** either (1) that a rational

32

defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480 (emphasis added).

In considering whether a duty to consult existed, the Court must consider the totality of the circumstances, "tak[ing] into account all the information counsel knew or should have known." *Id*. In that regard, though not determinative, "**a highly relevant factor** in this inquiry will be whether the conviction follows a trial or a guilty plea, both because <u>a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings</u>." *Id*. (emphasis added). Notably, however, "[e]ven in cases when the defendant pleads guilty, <u>the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights</u>." *Id*. (emphasis added).

As to the first part of the *Flores-Ortega* test, *i.e.*, whether an appeal was objectively beneficial, the totality of the circumstances in this case do <u>not</u> support a finding that "a rational defendant would want to appeal." As Mr. Schiavone states in his affidavit, and as evidenced on the record, Defendant pleaded guilty pursuant to a Rule 11(c)(1)(C) plea agreement and Defendant's ultimate sentence was entirely consistent with the terms of that plea agreement. (Doc. 115 at 1-2, ¶¶ 4, 6). Additionally, Defendant's plea agreement included a Waiver of Appeal provision, which provision specifically stated that Defendant waived the right to appeal the conviction and sentence imposed, except for claims of ineffective assistance of counsel or prosecutorial

misconduct. (Doc. 55 at 4, ¶ 10). The Court further notes that the circumstances surrounding Defendant's guilty plea were extensively litigated, culminating in this Court issuing an Order that unequivocally found the plea to be valid. And, of course, Mr. Schiavone was present during the sentencing hearing, and had the opportunity to fully gauge whether any aspect of that proceeding could support an appealable issue.

In light of everything Mr. Schiavone knew at the time, the Court concludes that it was entirely reasonable for counsel to determine that a rational defendant would have no interest in pursuing an appeal. Indeed, Mr. Schiavone states in his Affidavit that he did not discover any appealable issues in this case, nor did Defendant raise any potential appealable issues with him during any of their numerous meetings and communications. (Doc. 115 at 2, ¶¶ 10, 13, 14).

Turning to the second, subjective part of the *Flores-Ortega* test, the Court finds that there is no evidence to suggest Defendant reasonably demonstrated an interest in appealing. Specifically, Mr. Schiavone states that he was in "constant contact" with Defendant, before and after sentencing, "both in person at the Butler County Jail as well [as] telephone contact at least three (3) times per week." (Doc. 115 at 2, ¶ 7). Mr. Schiavone further states that "[Defendant] seemed to understand that his Plea Agreement at paragraph ten serves to waive appeals of conviction and sentence imposed with the exception of ineffective assistance of counsel or prosecutorial misconduct." (*Id*. at ¶ 9). And Mr. Schiavone also notes that, "[a]fter sentencing, [Defendant's] primary concern was the location of his institution." (*Id*. at ¶ 8). Mr. Schiavone also affirms that he

checked his case file and found no evidence that would indicate Defendant expressed to him a desire to appeal. (*Id*. at ¶ 12).

Based on the circumstances, the Court finds that counsel had no reason to believe that Defendant would want to appeal in this particular case. The Court notes that Mr. Schiavone had numerous meetings with Defendant, thereby allowing him ample opportunity to gauge Defendant's interests and concerns.[13] Despite these numerous meetings, there is not one shred of evidence to indicate that Defendant ever expressed an interest in appealing. Indeed, Defendant's most notable concern was the location of his designated Bureau of Prisons facility, which would, in turn, suggest Defendant's desire to move on from court proceedings. Moreover, Mr. Schiavone states that Defendant appeared to understand that his right to appeal was largely foreclosed by the plea agreement. Accordingly, the Court finds no indication that Defendant ever expressed or implied any interest in pursuing an appeal.

Given the totality of the circumstances, the Court finds that counsel did not have a duty to consult with Defendant regarding an appeal. That is, counsel had no "reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably

---

[13] To reiterate, for purposes of this analysis, the Court assumes that these meetings did not serve as appellate "consultations" as defined by the Supreme Court. Nevertheless, the fact that meetings and communications occurred, and counsel's takeaways from these meetings, are relevant to the Court in considering whether counsel should have known Defendant may want to appeal, such that a duty to consult arose.

demonstrated to counsel that he was interested in appealing." *See Flores-Ortega*, 528 U.S. at 480.

In sum, the Court finds that Mr. Schiavone neither disregarded specific instruction to file a Notice of Appeal, nor did Mr. Schiavone have a duty to specifically consult with Defendant about filing an appeal. Accordingly, counsel's performance was not deficient, and Defendant fails to satisfy the first *Strickland* prong.

### ii. Second Strickland Prong – Prejudice

Having determined that counsel performance was not deficient, the Court need not address the issue of prejudice. *Strickland*, 466 U.S. at 697. Nevertheless, the Court undertakes the additional analysis and finds that Defendant's claim also fails because he has not evidenced prejudice.

To start, the Court reiterates that it is a "critical requirement that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal." *Flores-Ortega*, 528 U.S. at 484. Setting aside the fact that the Court has found no deficiency in counsel's performance, Defendant also fails to evidence that he ever had any intention to appeal. Defendant offers no evidence that he ever asked counsel to file a notice of appeal nor even inquired about his appellate options. Defendant offers no nonfrivolous claims he may have raised on appeal, nor have the Court or counsel identified any such possible claims. *See id.* at 486 (holding that a defendant is not required to identify meritorious claims to prevail, but that the ability to do so can help to evidence an intent to appeal).

Indeed, as to potential claims, in his original 2255, Defendant merely states that: "Shortly after sentencing, [Defendant] informed his attorney that he wished to appeal from final Judgment … [and] wanted to appeal the sentence and conviction of the Court." (Doc. 93 at 15, ¶ 12). Yet, Defendant does not even acknowledge the fact that his plea agreement contained a fairly strict appellate waiver, which waiver barred him from appealing his conviction and sentence. And while the Court acknowledges that Defendant takes issue with the validity of his plea for purposes of his 2255 claims, Defendant does not state at any point that he would have raised these issues on appeal. Nor can the Court conclude that any such intent would have been even remotely meritorious.

Beyond that, Defendant's only other reference to a potential issue for appeal is contained in his Affidavit, stating: "Affiant states counsel never discussed the advantages or disadvantages of filing a notice to appeal the court sentenc[ing] him 8 months outside the suggested advisory guideline …." (Doc. 108 at 3, ¶ 20) (emphasis added). Again setting aside Defendant's claim as to counsel, the issue Defendant identifies regarding his sentence is patently false. Defendant received a sentence of 188 months, whereas his advisory Guidelines range was 262 to 327 months. (Doc. 91 at 2; Doc. 92 at 1). Thus, not only was Defendant's sentence not eight months *above* the Guidelines, but was actually 74 to 139 months *lower*—a full **6 to 11 years less** than what the Guidelines suggested. Nor was the 188 month sentence outside the 11(c)(1)(C) range. Defendant's Rule 11(c)(1)(C) plea agreement, accepted by this Court, proposed a sentence "not to exceed one hundred and eighty-eight (188) months imprisonment," which proposal was

effectively 120 to 188 months due to the mandatory minimum.  (Doc. 55 at 3, ¶ 7a).  So, Defendant's 188 month sentence is entirely consistent with the 11(c)(1)(C) range as well.

Apart from failing to show any intent to appeal, whether by identifying nonfrivolous claims or evidencing that he instructed or even asked about filing an appeal, Defendant's conduct after the 14-day appellate window also undermines the notion that he wanted to pursue an appeal.

As the Court previously noted, Defendant's 14-day appellate window lapsed on June 10, 2022.  On October 14, 2022, Defendant filed his original 2255 (Doc. 93) and then on November 21, 2022, he filed his late *pro se* notice of appeal (Doc. 94).  In other words, despite claiming that he wanted to appeal timely and instructed his attorney accordingly, upon counsel's alleged failure to file a notice of appeal, Defendant did not seek to pursue his own *pro se* appeal for almost six months.  And, indeed, he only did so after **first** filing a collateral attack.[14]  Most significantly, however, even after filing his *pro se* notice of appeal, the Court of Appeals gave Defendant <u>four separate opportunities over the next four months</u> to either proceed *pro se*, retain new appellate counsel, or seek the appointment of appellate counsel.  <u>Defendant disregarded each of these opportunities</u>, leading to the dismissal of his appeal for lack of prosecution.  And Defendant cannot excuse this failure, given that <u>he was actively filing pleadings in this Court</u> regarding his 2255 <u>during the same time frame</u> that the Court of Appeals was seeking Defendant's

---

[14] This also gives credence to Mr. Schiavone's observation that Defendant "seemed to understand" the limitations imposed by the appellate waiver.  (*See* Doc. 115 at 2, ¶ 9).

response. (*See* Docs. 106, 107, 108, 109, 111); *see also Washington, Jr.*, No. 22-4012 (6th Cir., Docs. 5, 6, 7, 8).[15]

In short, the record in this case (and Defendant's short-lived appeal) entirely undermines any suggestion that Defendant intended to appeal, instructed counsel to appeal, or would have appealed timely. Accordingly, Defendant fails to show that he was "deprive[d] a defendant of an appeal that he otherwise would have taken." *Flores-Ortega*, 528 U.S. at 484. Therefore, Defendant has not made a showing of prejudice, and he is entitled to no relief.

### 2. Trial Counsel Failed to Inform the Court There Was No Evidence of Guilt and that Defendant Doesn't Understand Charges (Ground 1 of Amended 2255)

Next, Defendant argues that his trial attorney, Mr. Dutta, was ineffective for failing to inform the Court, during the plea colloquy, that there was "no evidence" of guilt and that Defendant does not understand the charges against him. (Doc. 103 at 5).

To start, during the plea colloquy, Defendant confirmed, on the record, that he had in fact read and reviewed the charges with his attorney. (Doc. 74 at 30). Defendant's competency evaluation also notes that Defendant displayed an adequate understanding of the charges against him. (Doc. 35 at 21). Defendant's plea agreement also states that "[Defendant] has conferred with his attorney regarding … the facts and circumstances of

---

[15] As an aside, it bears noting that, if Defendant were to prevail on the instant claim, it would have no bearing on his conviction or sentence, but rather would reset Defendant's appellate window in order to allow him to file an appeal. But, of course, Defendant has already done so, and squandered the opportunity. And while this certainly does not preclude relief, it does raise questions as to the continued expenditure of judicial resources for a litigant who pursues the same non-meritorious and factually inaccurate claims to no end.

this case, including the applicable law and potential defenses, and that he is fully satisfied with the representation, advice, and other assistance of his attorney in this case." (Doc. 55 at 5, ¶ 15). In short, there is no evidence that Defendant did not understand the charges. And, therefore, counsel could not have accurately made such representations to the Court.

The Court also rejects the notion that counsel should have informed the Court, during the plea colloquy, that there was no evidence in this case. To start, there was clearly probable cause in this case, as evidenced by the Indictment. That alone belies the assertion that there was "no evidence." The Government's Trial Brief also sets forth a summary of what the Government believed the evidence would prove had the case gone to trial—all of which sufficiently implicates Defendant. (Doc. 46).[16] It also bears noting that Defendant was charged with transporting a minor for the purpose of engaging in a commercial sex act, and Defendant was arrested in this case when he arrived to pick up the Minor Victim, from a motel room, where she had been left to engage in prostitution. (Doc. 46 at 2). All in all, the notion is that there was "no evidence" in this case is patently incorrect.

Nevertheless, to the extent Defendant is arguing not that the evidence was non-existent but rather that the evidence was insufficient to warrant a conviction, that is a decision for the jury to make, not counsel. But Defendant knowingly and voluntarily

---

[16] The Court also notes that it received trial exhibits from the parties prior to the morning of *voir dire*/the change of plea hearing. Because the case did not proceed to trial, these exhibits were not admitted into evidence. Nevertheless, the exhibits exist. And that too belies Defendant's assertion that there was "no evidence."

chose to forego testing the sufficiency of the evidence and, instead, elected to accept a plea deal, admit responsibility for his conduct, and plead guilty. Counsel could not usurp Defendant's decision, gratuitously opine on the sufficiency of the evidence, and insist on gambling the remainder of Defendant's natural life at a jury trial that Defendant was expressly asking to waive.

Finally, Defendant cannot claim to have been prejudiced by counsel's "failure" to make inaccurate and inappropriate representations to the Court.

In sum, Defendant fails to show either deficiency or prejudice and, therefore, this claim fails.

### 3. Trial Counsel Failed to Take Case to Trial and Present "Judicially Noticed" Alibi Evidence (Ground 2 of Amended 2255)

Defendant argues that "counsel failed to subject the Government's case to a meaningful adversarial testing in the fact of judicially noticed alibi evidence suggesting [Defendant's] actual innocence." (Doc. 103 at 6).

As the Court has already stated, <u>counsel could not take the case to trial over Defendant's express intent to proceed with a guilty plea</u>. Any such attempt would have been entirely inappropriate and would have constituted ineffective assistance of counsel. Counsel cannot be faulted for providing appropriate representation, consistent with Defendant's wishes.

Moreover, there was no "judicially noticed" evidence of any sort in this case—let alone alibi evidence. And, in any event, both counts of the Indictment charge conduct spanning from December 2016 to April 18, 2017. Short of having been hospitalized or

incarcerated (neither of which is the case here), the Court cannot fathom how Defendant would have a five-month "alibi." Nor does Defendant expand upon this assertion.

Counsel cannot be faulted for failing to present evidence of an iron-clad alibi, that Defendant fails to identify and that reasonably cannot exist, at a trial that Defendant expressly waived. Nor can Defendant have suffered any prejudice as a result. Accordingly, this claim fails.

### 4. Trial Counsel Failed to Explain the Elements of the Offenses (Ground 3 of Amended 2255)

Defendant argues that trial counsel, Mr. Dutta, "failed to provide an adequate explanation about the elements of the charges," which in turn "affected [his] decision making process to proceed to trial or plead guilty. [Defendant] wanted to proceed to trial." (Doc. 103 at 8).[17]

As set forth in Section B.2., *supra*, the record evidences that Defendant understood the charges against him. As to the elements specifically, Defendant's plea agreement lists the elements of the offense to which Defendant pleaded guilty. (Doc. 55 at 1, ¶ 2). And Defendant confirmed, in writing, in the plea agreement, that he had "read this agreement and carefully reviewed every part of it with my attorney." (*Id*. at 5). The elements were also read in open court during the plea colloquy. (Doc. 74 at 37). Defendant's plea agreement also states that "[Defendant] has conferred with his attorney regarding … the facts and circumstances of this case, **including the applicable law** and

---

[17] The Court merely notes the inconsistency of Defendant saying that counsel's failure deprived him of the ability to make an informed decision as to whether to plead or go to trial, only to immediately follow that statement by claiming that he wanted to go to trial.

potential defenses, and that he is fully satisfied with the representation, advice, and other assistance of his attorney in this case." (Doc. 55 at 5, ¶ 15) (emphasis added). Moreover, Defendant signed the Statement of Facts, which facts effectively mirror the elements verbatim. (Doc. 55 at 7). The Statement of Facts was already read in open court during the plea hearing, after which Defendant confirmed that the facts were entirely correct. (Doc. 74 at 42).

In short, the record evidences that Defendant was well aware of the charges against him and had specific knowledge of the elements of the offense. Defendant fails to identify any meaningful deficiency in counsel's explanation of the offense. Moreover, given Defendant's admission to the Statement of Facts, which facts substantively mirror the elements of the case, Defendant fails to articulate how further explanation of the elements would have changed his decision making process.

Accordingly, Defendant has neither shown that his counsel's performance was deficient, nor that he suffered any prejudice. Therefore, Defendant's claim fails.

### 5. *Trial Counsel Failed to Inform the Court that Defendant was on the Wrong Medication (Ground 4 of Amended 2255)*

Next, Defendant argues that trial counsel, Mr. Dutta, was ineffective for failing to advise the Court that Defendant "was on the wrong medication that rendered him incapable of entering into a voluntary and intelligent plea." (Doc. 103 at 10; Doc. 109 at 5). Defendant's claim fails because it is factually inaccurate, as Defendant himself acknowledged on the record during his change of plea hearing.

43

Specifically, at the time of Defendant's arrest, his prescription regimen consisted of three separate psychotropic medications, including two pills to be taken daily, as well as one monthly injection. (Doc. 35 at 4). During the Court's reasonable cause hearing on competency, Defendant advised the Court that, since his arrest, he was receiving his two daily pills, but had not received his monthly injection. (Doc. 33 at 13-14). At the conclusion of the hearing, the Court stated its intent to order a competency evaluation and noted that the evaluation would, *inter alia*, "help us as to whether his medication is sufficient or whether there are better options." (*Id*. at 18). The Court's subsequent Order for a competency evaluation also stated that, "[o]f particular interest to the Court is … whether Defendant's current medications are appropriate and sufficient to provide him adequate treatment …." (Doc. 32 at 4). The Competency Evaluation confirmed that Defendant's three-medication regimen was appropriate, that it was Defendant's requested treatment, and that it was fully and effectively managing his mental health symptoms. (Doc. 35 at 8, 11, 26). Defendant was ultimately found competent to stand trial. (Docs. 35, 36).

Thereafter, as suggested in Defendant's Competency Report, the Court did in fact ensure that Defendant was receiving his appropriate medication while at the county jail. And, as previously noted, the Court specifically inquired of Defendant's medication in the weeks leading up to trial and received confirmation that Defendant has been compliant with his medication. *See* n.6, *supra*.

Most importantly, however, Defendant himself confirmed, on the record, during the change of plea hearing, that he was in fact receiving his medication. Indeed, in

response to the Court's inquiry regarding whether Defendant was receiving appropriate medication at the county jail, Defendant confirmed he was receiving his three medications and further stated: "Oh, yeah. I take my **regular** meds." (Doc. 74 at 31, 32) (emphasis added). In other words, not only did Defendant confirm that he was taking medication, but he specifically confirmed that he was in compliance with his "regular" regimen.

In short, the record wholly undermines Defendant's contention that he was on the "wrong medication" and, in fact, thoroughly evidences that Defendant was on the correct regiment and fully competent. Accordingly, counsel was not ineffective for failing to falsely advise the Court otherwise. Nor could Defendant have been prejudiced by counsel not making such false representations to the Court.

### 6. *Trial Counsel Coerced Defendant to Forego Trial and Present Victim and Five Others as "Alibi" Witnesses (Ground 5 or Amended 2255)*

Defendant once again argues that his trial attorney, Mr. Dutta, and Co-Defendant's counsel, Mr. Hudson, "coerced [Defendant] to plead guilty under false pretenses," and that if he had gone to trial, "[the Minor Victim] and 5 other alibi witnesses would have confirmed [Defendant] is actually innocent of the charges against him." (Doc. 103 at 15).

The Court has already found, both in this Order and its prior Order denying Defendant's motion to withdraw his plea, that Defendant was not coerced into pleading guilty. (*See* Doc. 82 at 20-26; *see supra*, Section III.A.1. & III.B.1). The Court will not reiterate those findings again. The Court has also found that counsel was not ineffective for failing to insist on a jury trial that Defendant wanted to waive, in order to present

"alibi" witnesses that could not plausibly account for Defendant's constant whereabouts over a five month period. (Section III.B.3., *supra*).

But the Court takes particular issue here with Defendant's contention that the Minor Victim would have served as his alleged "alibi" witness. Defendant also alleges that the Minor Victim previously "testified at length under oath on a (3) three hour video explaining [Defendant] was her boyfriend who was trying to help her." (Doc. 109). To be clear, because Defendant chose to plead guilty, the Minor Victim did not have an opportunity to testify in this case. And there is no evidence that the Minor Victim ever gave recorded, sworn testimony in any context. The Minor Victim did, however, for purposes of Defendant's sentencing, provide a graphic account of Defendant's conduct towards her. As noted in the PSR:

> Minor Victim A described [Defendant] as a **man who raped her** an "unknown" amount of times. *He* referred to *her* as his girlfriend. She became pregnant with [Defendant's] child; however, suffered a miscarriage after [Co-Defendant] beat her and due to her drug use. Minor Victim A stated following the miscarriage, [Defendant] made statements about their dead child as a way to further manipulate her and cause her anguish.
>
> Minor Victim A stated the Washingtons [(*i.e.*, Defendants, plural)] forced her to have sex with hundreds of men. The sex was frequently unprotected. At one point, she returned to the Washington home [(*i.e.*, the home where Defendants both resided)] and numerous men engaged in sex with her, one after the other.

(PSR at 8-9, ¶¶ 37, 38) (emphasis added). The Minor Victim also stated that, after her cousin encouraged her to come live at Defendants' home:

> The Washington brothers [*i.e.*, Defendants, plural] immediately gave her cocaine base and she quickly became

46

> addicted to the substance.  Minor Victim A stated she was not
> addicted to cocaine base prior to meeting the Washingtons
> [Defendants, plural].  She further stated the Washington
> brothers [Defendants, plural] held her down and injected her
> with drugs on at least two occasions.

(*Id*. at 8, ¶ 33) (emphasis added).  The Minor Victim concluded the interview by telling

the Court that she "hopes the Court sentences the defendants to lengthy terms of

imprisonment.  … She does not want to see any of the defendants victimize other young

girls."  (*Id*. at 9, ¶ 39) (emphasis added).

Defendant's insinuation that the same victim who made **those** statements to the

Court would somehow have testified favorably towards him had the case gone to trial

simply defies logic.[18]

The Court also notes that Defendant's claim that he is "actually innocent" is

rebutted on the record, most notably by Defendant himself.  Beyond knowingly and

voluntarily pleading guilty, and affirming the accuracy of the Statement of Facts,

Defendant has also made numerous post-plea statements maintaining or implying his

guilt, including to the Probation Officer during his Presentence Investigation and during

recorded jail calls with his family.  (*See* PSR at 7, ¶ 28; Doc. 70 at 7).

---

[18] Even if the Court were to assume that some video exists (perhaps an initial police interview) in which the Minor Victim made contradictory statements, such evidence may have served as impeachment, but by no means would it have established Defendant's innocence.  The jury still would have had to decide whether to rely on a traumatized victim's earlier statements (likely to law enforcement), versus her sworn testimony before them in the courtroom and in the context of all the other evidence the Government would have presented.  And still, nothing the Minor Victim could have said about her perception of the situation would *guarantee* Defendant's acquittal, given that the jury would have to weigh it against the remaining evidence.  The Court cannot find fault in any attorney who counsels against taking such a gamble.

In sum, the Court finds that counsel did not coercively deprive Defendant of the opportunity to present evidence at trial. And, in any event, Defendant fails to identify any evidence that would have made any meaningful difference to a jury, let alone virtually guarantee his acquittal. Accordingly, Defendant fails to show any error of counsel or any resulting prejudice. Therefore, this claim also fails.

### 7. *Trial Counsel Failed to Advise Regarding Restitution (Ground 6 of Amended 2255)*

Defendant next argues that his plea is invalid because his trial counsel, Mr. Dutta, "failed to advise [Defendant] of the possibility of a restitution demand order prior to plea [which] constitutes a material variance from the plea agreement if that restitution is so substantial." (Doc. 103 at 15).

As an initial matter, Defendant's Plea Agreement specifies that restitution is mandatory in this case and, further, includes a paragraph in which Defendant expressly agrees to pay restitution to the victim. (Doc. 55 at ¶¶ 3.b. & 8). And, as this Court has previously stated, the Plea Agreement contains Defendant's express assurance, above his signature line, that: "I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, I voluntarily agree to it, and I do not wish to change any part of it." (*Id*. at 5). Moreover, the restitution was mentioned during the plea hearing no less than <u>seven times</u> before Defendant actually entered his plea of guilty. (Doc. 74).

And while the amount of the restitution was not specified in the plea agreement or during the plea hearing, this does not constitute a "material variance." That is, Defendant

was never assured, nor was it even implied, that the restitution would be for some lesser amount.  No amount was discussed at all because the amount of the restitution was not known.  Indeed, it took the Minor Victim's court-appointed Guardian Ad Litem <u>months</u> of diligent effort to gather the necessary documentation and calculate a reasonable estimate of the Minor Victims past medical expenses, future medical needs and costs, and lost income.  (Docs. 59, 72).

Thus, Defendant was well-aware of his obligation to pay restitution, the ultimate restitution Order was not inconsistent with the Plea Agreement, and counsel could not have advised him of a restitution amount that was entirely unknown to anyone.  Nor has Defendant shown that he was prejudiced by the restitution Order, such that he would not have pleaded guilty had he known the restitution amount in advance.

Accordingly, this claim fails.

### 8. *Trial Counsel Failed to Advise Defendant that Mere Presence at the Scene of a Crime is Insufficient to Establish Guilt (Ground 7 of Amended 2255)*

Finally, Defendant argues that his trial counsel, Mr. Dutta, "failed to ensure [Defendant] understood mere presence and culpable presence are different facts and 'mere presence' at the scene of a crime is insufficient to establish guilt." (Doc. 103 at 15).

Defendant fails to explain how this statement is relevant in his case.  As the Court has discussed at length, there was ample anticipated evidence of Defendant's offense conduct—far beyond his "mere presence."  Nor does Defendant claim that a thorough

explanation of "mere presence" would have changed his decision to plead guilty, given the actual circumstances of his case.

Additionally, Defendant's Plea Agreement states that "[Defendant] has conferred with his attorney regarding … the facts and circumstances of this case, including the applicable law and **potential defenses**, and that he is fully satisfied with the representation, advice, and other assistance of his attorney in this case." (Doc. 55 at 5, ¶ 15) (emphasis added). Moreover, the Statement of Facts, which Defendant signed and affirmed under oath during his plea colloquy, definitively establish more than Defendant's "mere presence" at the scene of the crime. (*Id*. at 7).

Ultimately, this claim is, once again, merely an argument aimed at the sufficiency of the evidence. And whether the evidence was sufficient to convict was a question for the jury. Defendant, however, made the decision to forego a jury trial and plead guilty instead. Counsel could not ignore Defendant's wish to opt for the certainty of a plea agreement over the risks of a trial. Nor can this Court conclude that it would have been reasonable for counsel to advise against a plea for the sake of arguing to a jury that, contrary to any other evidence presented, Defendant was "merely present" at the scene of a five-month-long offense. And Defendant has neither shown, nor argued, that he was prejudiced by not receiving such advice from counsel.

Accordingly, this claim also fails under both prongs of the *Strickland* analysis.

## IV.  CONCLUSION

Based upon the foregoing:

(1)  Defendant's original and amended motions to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255 (Docs. 93, 103) are **DENIED**; and

(2)  The Court finds that any appeal of this Order would be objectively frivolous, and that jurists of reason would not disagree with the Court's resolution of Defendant's constitutional claims, nor would jurists conclude that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Accordingly, the Court **DENIES** the issuance of a certificate of appealability, pursuant to 28 U.S.C. § 2253(c).

**IT IS SO ORDERED.**

Date: 7/29/2024

Timothy S. Black
United States District Judge